

# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

## NO. PD-0290-23

**TAREQ ALKAYYALI, Appellant**

**V.**

**THE STATE OF TEXAS**

### ON STATE'S PETITION FOR DISCRETIONARY REVIEW FROM THE SECOND COURT OF APPEALS TARRANT COUNTY

NEWELL, J., announced the judgement of the Court and delivered an opinion of the Court in which SCHENCK, P.J., RICHARDSON and MCCLURE, J.J., joined. YEARY, J., filed a concurring opinion in which SCHENCK, P.J., joined. FINLEY, J., filed a dissenting opinion. PARKER, J., filed a dissenting opinion. KEEL, J., dissented. WALKER, J., did not participate.

### <u>OPINION</u>

If a jury charge fails to require that the State prove every contested element of an offense beyond a reasonable doubt, does this

result in egregious harm? Yes. In this case, the jury charge authorized the jury to convict Appellant of murder without requiring that the jury find beyond a reasonable doubt that Appellant caused the victim's death. This jury charge error resulted in egregious harm.[1] We affirm the judgment of the court of appeals.

## Background

Appellant moved to Texas in 2009 but frequently traveled back and forth to Jordan. In April 2017, Appellant met Wasam Moussa in Jordan. In November of that year, Appellant and Moussa were engaged, and in August 2018, they married. Both the engagement and marriage took place in Jordan.

Within twenty-four hours of their marriage, Moussa told Appellant and her family that she wanted a divorce. She did not provide an explanation as to why. Nevertheless, Moussa and Appellant remained married. In September 2018, Appellant returned to Texas where he worked as a manager at IHOP; Moussa continued living in Jordan. During this time, Appellant filled out immigration paperwork for Moussa

---

[1] *See Apprendi v. New Jersey*, 530 U.S. 466, 477 (2000) (noting the right to due process and to a jury trial "entitle a criminal defendant to 'a jury determination that [he] is guilty of every element of the crime with which he is charged, beyond a reasonable doubt'"); *In re Winship*, 397 U.S. 358, 364 (1970) ("[W]e explicitly hold that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.").

to come to the United States, but she continued living in Jordan with her family. Moussa repeated her request for a divorce without providing a reason for it. Neither she nor Appellant filed for divorce in either Jordan or Texas.

On May 25, 2019, Moussa moved to Texas from Jordan to live with Appellant. Three days later Appellant called Vernie "Alicia" Smith, his friend and coworker, while he was driving to work.[2] Appellant told Smith that he hit Moussa, she started screaming, he covered her mouth, and then Moussa stopped breathing.[3] Smith told Appellant to call 911 and get help. Appellant returned to the apartment and called 911. Smith also called 911 and reported that Appellant had hit his wife, covered her mouth, and that she was not breathing.

When officers from the Arlington Police Department arrived, they found Moussa unresponsive on the floor. One officer checked her pulse and began administering CPR. Paramedics then arrived, and again checked to see if Moussa had a pulse. After confirming that she did not,

---

[2] Prior to Moussa's arrival in Texas, Appellant texted Smith that he hated his job, life, and wife. Appellant also texted Smith and relayed that Moussa was being "childish" and a "bitch." Moussa deleted their photos from Facebook, then blocked Appellant from Facebook and Instagram. Additional text messages were introduced between Smith and Appellant where Appellant expressed concerns about Moussa, including her lack of respect for Appellant, that she treated him like "shit," and that she "has a black soul."

[3] Appellant's first language is Arabic. He testified that the English translation of the Arabic word for fainting is "not breathing."

one paramedic took over and continued CPR.  The paramedics also used a bag volume mask to squeeze air into Moussa's lungs before they eventually intubated her.   The paramedics performed life-saving measures for approximately forty-five minutes between their time of arrival and transporting Moussa to the hospital.   Moussa was never revived.[4]

## Trial

The State charged Appellant with the murder of Moussa.   The indictment alleged two alternate theories:

That Tareq Alkayyali, hereinafter called defendant, on or about the 28th day of May 2019, in the County of Tarrant, State of Texas, did then and there intentionally or knowingly cause the death of an individual, Wasam Moussa, by impeding the normal breathing of circulation of the blood of Wasam Moussa by applying pressure to her throat or neck with his hand or arm or by blocking her nose or mouth with his hand or hands,

Paragraph two: and it is further presented in and to said court that on or about the 28th day of May 2019 the defendant in the County of Tarrant and State aforesaid did then and there intentionally, with the intent to cause serious bodily injury to Wasam Moussa, commit an act clearly dangerous to human life, namely, by impeding the normal breathing or circulation of the blood of Wasam Moussa by applying pressure to her throat or neck with his hand or arm or by blocking her nose with his hand or hands[.]

---

[4] The record does not state when Moussa was pronounced dead.  James Anderson, one of the paramedics, arrived at the scene at 6:45 a.m.  He testified that they arrived at the hospital at approximately 7:30 a.m.  Homicide Detective Julia Hall testified that she was called at 8:00 a.m.  She also testified that prior to being dispatched or called out, Moussa was pronounced dead.

Section 19.02(b) of the Texas Penal Code provides the elements for the offense of murder.[5] The first paragraph of the indictment tracks the language of section 19.02(b)(1).[6] The second paragraph of the indictment leaves out an essential element of the offense from section 19.02(b)(2).[7] That code section reads that a person commits the offense of murder if that person, "intends to cause serious bodily injury and commits an act clearly dangerous to human life *that causes the death of an individual*[.]"[8] But the indictment only alleged that Appellant had intended to cause serious bodily injury and committed an act clearly dangerous to human life without alleging that Appellant had caused Moussa's death.

The State proceeded on the theory that Appellant had strangled Moussa either by choking her or by covering her mouth so she could not breathe. The State called Alicia Smith who recounted her phone call with Appellant on the day of the offense. Smith testified that Appellant

---

[5] *See* Tex. Penal Code Ann. § 19.02(b) ("A person commits an offense if the person: (1) intentionally or knowingly causes the death of an individual; (2) intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual").

[6] *Id*.

[7] *Id*.

[8] *Id*. (emphasis added).

called her and told her that he had hit Moussa, she started screaming, he covered Moussa's mouth, and that she was not breathing.

Paramedic James Anderson testified that after checking Moussa's pulse he took over CPR from a police officer. Then, Anderson testified to using a bag volume mask, which squeezes air into a person and breathes for them, before eventually intubating Moussa. A laryngoscope with a camera on the end was used to determine if anything was blocking Moussa's airway while also helping guide the intubation tube. Anderson testified that he found bloody frothy sputum in the back of Moussa's throat. He stated that it is rare to see this upon initial intubation. It is usually seen after a tube has been placed and CPR has been performed for some time as a result of the trauma of pushing on someone's chest. The State asked if frothy blood could be caused by strangulation or smothering, and Anderson answered that it's possible. Anderson also recalled seeing ligature lines across Moussa's neck.

Anderson prepared a report after treating Moussa. The report indicated Moussa had a blocked airway, but Anderson testified that his report did not use the word "strangled."[9] However, the narrative notes from the emergency room stated that EMS reported patient was

---

[9] Under causes of injury, the EMT report states "asphyxia – airway blocked/choking (intentional, other(assaulted))."

strangled by male husband. Anderson testified that sometimes beliefs or opinions are relayed to a doctor to help guide treatment. But Anderson also testified that those beliefs or opinions are not noted in their documentation because the paramedics cannot prove them.

Medical examiner Richard Fries testified about the results of Moussa's autopsy.[10] Dr. Fries explained that Moussa had various lacerations and bruises on her lip as well as "indistinct" bruising on her neck and chest. He later stated that the small bruise under Moussa's chin together with less prominent, faint linear red areas were consistent with force applied at and around the neck.

Dr. Fries noted that Moussa had some blood on her face and a spot of undried blood on her chin. He further testified that if a person is suffocated or strangled that a foam or froth can develop in the throat. Dr. Fries stated that Moussa had petechial hemorrhages under her scalp but nowhere else. These can appear when the jugular vein is blocked. They can also appear in the eyes, face, and skin, but Dr. Fries testified that he did not find petechiae in these locations.

---

[10] An autopsy was performed by medical examiner Marc Krouse. However, Dr. Krause did not testify at Appellant's trial because, at that time, he had been terminated from the medical examiner's office due to his "lack of due diligence" in many of his autopsy reports. Dr. Fries testified at trial based on his own conclusions after examining the autopsy report and the pictures produced for that report.

Dr. Fries also explained that there was evidence Moussa had an issue with her cardiovascular system, specifically a ventricular septal defect.  He stated that this defect, commonly referred to as a "hole in the heart," was repaired and intact.  However, Dr. Fries also testified that even if Moussa's heart repair was not in place, it would take a long time for a young person to go into heart failure.

Additionally, Dr. Fries discussed Moussa's EKG from 2018, which showed nonspecific changes.  These changes were to be expected because Moussa's hole was in her septum, and because the conduction system runs through there, some irregularities are expected.  Therefore, Moussa's 2018 EKG was considered normal.  After reviewing the autopsy report and photos of Moussa, Dr. Fries classified her death as homicide and asphyxia.

Appellant proceeded on the theory that Moussa's death was a terrible and tragic accident.  Appellant testified at trial that there was tension between himself and Moussa as soon as she arrived in Texas.  Moussa occupied the apartment bedroom alone, leaving Appellant to sleep on the couch for three nights.  Appellant explained that the day before the victim's death, he and Moussa agreed to divorce after a loud argument.  During the argument, Moussa began screaming and Appellant moved toward her to put his hand over her mouth.  Appellant

stopped after Moussa screamed "don't touch me."  The next morning, Appellant and Moussa argued again as Appellant prepared for work.  The argument became physical, and Appellant pushed Moussa.  She yelled, and Appellant put his hand over her mouth to stop her yelling.  The two fell to the floor at which point Moussa bit Appellant causing him to release his hand.  However, Appellant again put his hand over Moussa's mouth to prevent her from yelling, and then she fainted.

Appellant testified that he carried Moussa to the bedroom after she fainted.  He then called his manager, Lauren Hastings, around 6 a.m. to explain he would be late for work.  Then he left.  He returned to the apartment after speaking with Alicia Smith and calling 911, as described above.  Appellant testified that things would be different if he had just left that morning to go to work.

Appellant presented testimony to develop the theory that Moussa's death was an accident and that she died due to her pre-existing heart condition, a condition which required surgery.  For example, Appellant, as well as his sister, testified that Moussa fainted at their wedding.  A wedding guest, who happened to be a doctor, encouraged Moussa to get checked out.  Days after the wedding, Moussa complained of chest pain and shortness of breath.  Appellant took Moussa to the hospital where lab evaluations were ordered as was emergency room

management. However, Moussa refused any treatment and was discharged from the hospital against medical advice.

Dr. Fries testified that Moussa's heart defect abutted her conduction system, which regulates a person's heartbeat. Dr. Fries stated that if a person has an irregular heartbeat, it can cause fainting. Furthermore, Dr. Fries noted that Moussa's hyoid bone was intact, which is evaluated in cases of strangulation. Additionally, Dr. Fries testified that Moussa did not have any bruising in her neck muscles, and further noted that Moussa did not have any ligature marks around her neck despite the testimony of James Anderson, the paramedic who testified that Moussa had ligature lines on her neck.

After the close of evidence, the court presented the jury with its charge. The abstract paragraph of the jury charge stated:

> A person commits the offense of murder if he intentionally or knowingly causes the death of an individual; or if he intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual.

The abstract paragraph of the jury charge instructed the jury on the elements of the offense. It included all the statutory elements for both theories of murder presented to the jury.

However, the application paragraph of the jury charge tracked the language of the indictment. It omitted the element "that causes the

death of an individual" from the second paragraph. So, while the first application paragraph required the jury to find every element of the offense beyond a reasonable doubt, the second application paragraph did not. Instead, the second paragraph informed the jury that it could nevertheless convict without determining whether Appellant's actions caused the victim's death. Appellant did not object to the defective jury instructions.

The State and Appellant relied upon different theories during closing arguments regarding the cause of Moussa's death. The State maintained that Appellant strangled and smothered Moussa causing her death. In its closing argument, the State pointed to Dr. Fries' testimony and to Moussa's contusions, abrasions, and petechiae on her scalp. These, the State posited, indicated that Appellant strangled and smothered Moussa for minutes.

The State noted that Appellant himself told Alicia Smith that he was going to jail for the rest of his life in a phone call he made to Smith prior to his calling 911. Furthermore, the State interpreted Appellant's testimony that things would be different if he had just left that morning to go to work and booked tickets so he and Moussa could return to Jordan to divorce as an admission to killing her. Additionally, the State argued that Moussa's heart repair was intact and not a cause for

concern. Turning to the fact that Appellant was bitten, the State surmised that Moussa bit Appellant because he was smothering her. And the bloody froth was a result of Moussa gasping for air while being suffocated.

Appellant's defensive theory sought to characterize the death of Moussa as a terrible and tragic accident. Appellant pointed to Moussa's repaired heart and numerous fainting episodes after her heart surgery. In his closing argument, Appellant noted that the extent of Moussa's heart problem was unknown because she refused to let anyone treat her. Appellant reiterated that Dr. Krouse, the original and non-testifying medical examiner, was fired for his lack of due diligence. Appellant contended, Dr. Krouse simply accepted that Moussa was strangled, as relayed in the emergency room reports, and did not work very hard on the autopsy given his lack of due diligence.

Appellant further argued in closing that Moussa had petechiae on her scalp but nowhere else. The bruising on her neck was superficial, and there was no damage to her larynx or cartilage. Appellant suggested that if you intend to kill someone, the hyoid bone is going to be broken and there will be damage to the larynx and neck muscles.

Lastly, Appellant pointed to the fact that his finger was bitten. He moved his hand back and forth to get his finger loose, applying some

force to Moussa's neck to get his finger back. Appellant concluded his argument by stating, "please, when you're looking at this evidence, you've got to hold the State to their burden and they have to prove this beyond all reasonable doubt that [Appellant] intended or knowingly killed her, and that is just not the case."

## Appeal

After the jury convicted Appellant of murder, he appealed his sentence. On appeal, Appellant argued, among other things, that he was egregiously harmed by the omission of the "causes the death of" element from the second theory alleged in the jury charge's application. The court of appeals addressed this error first, finding its resolution dispositive in this case.[11] Appellant contended that this error in the instruction allowed the jury to convict him of murder without requiring the jury to find that he caused Moussa's death.[12] While the State agreed there was error in the jury charge, it argued that Appellant did not suffer egregious harm as a result.[13]

---

[11] *Alkayyali v. State*, 668 S.W.3d 445, 452 n.9 (Tex. App.—Fort Worth 2023, pet. granted).

[12] *Id*. at 452.

[13] *Id*.

The court of appeals analyzed each of the four *Almanza* factors to determine if Appellant suffered egregious harm.[14]   First, the court of appeals explained that "the application paragraph authorized [the jury] to convict [Appellant] of murder without having to find beyond a reasonable doubt that he caused Moussa's death."[15]   Second, the court of appeals held that the state of the evidence weighed in favor of egregious harm because "[i]f even a single juror was persuaded that Moussa's health issues created enough reasonable doubt as to the cause of her death, then [Appellant] could not have been convicted of murder."[16]   As to the third *Almanza* factor, arguments of counsel, the court of appeals held that it did not weigh in favor of egregious harm, but the court did not provide much analysis on this point. [17]   Finally, the court looked at other relevant record information and held that this factor weighed in favor of egregious harm because the error affected Appellant's defensive theory.[18]

---

[14] *Id*. at 453; *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984).

[15] *Alkayyali*, 668 S.W.3d at 454.

[16] *Id*.

[17] *Id*.

[18] *Id*.

After reviewing all four factors, the court of appeals concluded the jury charge error resulted in egregious harm.[19] The court of appeals reversed Appellant's conviction of murder and remanded the case to the trial court.[20] The State sought discretionary review.

## Discretionary Review

We granted the State's petition which raises the following issue:

> Does a defendant suffer egregious harm from charge error that 1) related to an element the defendant effectively conceded and which was not a realistic possibility for acquittal, and 2) was limited to a manner and means of murder neither party argued over?

The State argues that the court of appeals reversed on purely theoretical harm. First, the State argues that a missing element is not proof of harm but rather the reason for a harm analysis. Next, the State contends that Appellant's chief defensive theory focused on a lack of criminal mental state rather than causation. Additionally, the State argues that the evidence does not show a viable causation argument and that there is no evidence to rationally support the argument that

---

[19] Appellant raised numerous points of error on appeal. Because Appellant's sufficiency of the evidence argument was not raised in his petition for discretionary review, we will limit our discussion to whether or not he suffered egregious harm as a result of the jury charge error. However, the court of appeals did conclude that there was legally sufficient evidence to support the jury's verdict despite agreeing with Appellant that he suffered egregious harm as a result of the jury charge error. *Id*. at 455-56.

[20] *Id*. at 457.

Appellant did not cause Moussa's death, alone or in conjunction with her alleged fainting problem.

## Standard of Review

The Supreme Court has recognized that the failure of a jury instruction to require a finding of an element of an offense beyond a reasonable doubt is not structural error and is subject to a harm analysis.[21] We recognized this in *Niles*, but in that case the element at issue was not contested.[22] In this case, it was.

When there is a claim as to jury charge error, there are two standards of review based on whether a defendant objected to the charge.[23] When a defendant objects to error in the jury charge, reviewing courts consider whether the error at issue resulted in some harm.[24] Some harm requires reversal "if the error is 'calculated to injure the rights of the defendant,'" meaning the error cannot be harmless.[25] When a defendant fails to object to error in the jury charge, reviewing

---

[21] *Niles v. State*, 555 S.W.3d 562, 570 (Tex. Crim. App. 2018) (citing *Neder v. United States*, 527 U.S. 1 (1999)).

[22] *Id*. at 571.

[23] *Alcoser v. State*, 663 S.W.3d 160, 165 (Tex. Crim. App. 2022).

[24] *Id.*

[25] *Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013) (quoting *Almanza*, 686 S.W.2d at 171).

courts consider whether the error results in egregious harm.[26] "An erroneous jury charge is egregiously harmful if it affects the very basis of the case, deprives the accused of a valuable right, or vitally affects a defensive theory."[27] Furthermore, egregious harm must be based on actual harm rather than a finding of theoretical harm.[28]

Egregious harm is a fact-specific analysis and is a difficult standard to meet.[29] To determine whether jury charge error resulted in egregious harm we look at the entire record.[30] Specifically, we consider (1) the entirety of the charge; (2) the state of the evidence, including the contested issues and weight of probative evidence; (3) the arguments of counsel; and (4) any other relevant information revealed by the trial record as a whole.[31]

---

[26] *Alcoser*, 663 S.W.3d at 165. Judge Finley argues that we should not hold there was egregious harm because doing so might incentivize defense attorneys to fail to object, but this would be true in any circumstance in which error amounted to egregious harm, and no one has asked this Court to revisit *Almanza v. State*. More importantly, the responsibility for properly instructing the jury on the law applicable to the case falls on the trial court not the litigants. *See* Tex. Code Crim. Proc. Ann. art. 36.14 ("[T]he judge shall, before the argument begins, deliver to the jury, except in pleas of guilty, where a jury has been waived, a written charge distinctly setting forth the law applicable to the case[.]").

[27] *Alcoser*, 663 S.W.3d at 165.

[28] *Id*.; *see also Cosio v. State*, 353 S.W.3d 766, 777 (Tex. Crim. App. 2011).

[29] *Alcoser*, 663 S.W.3d at 165.

[30] *Marshall v. State*, 479 S.W.3d 840, 843 (Tex. Crim. App. 2016).

[31] *Villarreal v. State*, 453 S.W.3d 429, 433 (Tex. Crim. App. 2015); *Almanza*, 686 S.W.2d at 171.

**Analysis**

Just as the court of appeals did below, we will review each of the four factors in turn. We agree with the court of appeals that the first factor—the entirety of the jury charge—weighs in favor of finding egregious harm. In this case, the abstract or definitional portion of the charge properly defined murder under Section 19.02(b)(2). However, the application paragraph failed to require the jury to properly apply those definitions. Error in the abstract paragraph of a jury charge does not constitute egregious harm when the application paragraph correctly instructs the jury.[32] Reversible error may occur when the abstract paragraph fails to provide a statutory definition of an element needed by the jury to determine whether the State proved the element beyond a reasonable doubt.[33] We see no reason why a failure in the application paragraph should be treated differently.

As the instrument by which a jury is empowered to conviction, jury charges are meant to inform the jury of how to apply the applicable law to the facts of the case.[34] The charge "must contain an accurate

---

[32] *Medina v. State*, 7 S.W.3d 633, 640 (Tex. Crim. App. 1999); *see also Meanes v. State*, 668 S.W.2d 366, 374-75 (Tex. Crim. App. 1983) (noting that the defendant in a capital murder case did not show how he was harmed when there was an absence of an abstract charge on capital murder but the application paragraph effectively defined capital murder).

[33] *MacDougall v. State*, 702 S.W.2d 650, 652 (Tex. Crim. App. 1986).

[34] *Alcoser*, 663 S.W.3d at 164-65.

statement of the law and must set out all the essential elements of the offense."[35]  The application paragraph is the "heart and soul" of the jury charge because it "specifies the factual circumstances under which the jury should convict or acquit."[36]    The application paragraph is the section of the jury charge that applies "'the pertinent penal law, abstract definitions, and general principles to the particular facts and the indictment allegations.'"[37]

Not all errors in the application paragraph amount to egregious harm, however.  In *Vasquez*, for example, this Court held that the defendant was not egregiously harmed when the trial court failed to directly incorporate the abstract definition of the law of parties in the application paragraph.[38]  But in *Vasquez*, the application paragraph still incorporated the proper definition of the law of parties from the abstract paragraph by reference.[39]  Conversely, this Court has that held the

---

[35] *Vasquez v. State*, 389 S.W.3d 361, 366 (Tex. Crim. App. 2012) (quoting *Dinkins v. State*, 894 S.W.2d 330, 339 (Tex. Crim. App. 1995)).

[36] *Id.* at 366.

[37] *Campbell v. State*, 664 S.W.3d 240, 246 (Tex. Crim. App. 2022) (quoting *Vasquez*, 389 S.W.3d at 366).

[38] *Vasquez*, 389 S.W.3d at 372.

[39] *Id*. at 371 (noting that the application paragraph "explicitly stated that the jury should find appellant guilty if, 'acting alone or as a party (as herein defined)").

omission of sudden passion as an element of voluntary manslaughter from an application paragraph resulted in egregious harm.[40]  In *Ruiz*, the State charged the defendant with murder and voluntary manslaughter for a shooting at a club.[41]  At the trial, the jury charge defined both murder and voluntary manslaughter, but the application paragraph failed to apply the element of sudden passion to the offense of murder.[42]  This Court held that "on the facts of this case, omission of the element of the absence of sudden passion from the charge on murder denied appellant a fair and impartial trial."[43]

In this case, the abstract paragraph of the jury charge stated:

A person commits the offense of murder if he intentionally or knowingly causes the death of an individual; or if he intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual.

---

[40] *Ruiz v. State*, 753 S.W.2d 681, 687 (Tex. Crim. App. 1988).  At the time of the offense in *Ruiz*, the statute for voluntary manslaughter included sudden passion as an element of murder. "A person commits an offense if he causes the death of an individual under circumstances that would constitute murder under Section 19.02 of this code, except that he caused the death under the immediate influence of sudden passion arising from an adequate cause." Tex. Penal Code Ann. § 19.04 (1973).  The current statute, now titled "Manslaughter," does not include the element of sudden passion. Tex. Penal Code Ann. § 19.04.

[41] *Ruiz*, 753 S.W.2d at 682.

[42] *Id*. at 682-83.

[43] *Id*. at 687.

This section of the jury charge tracks the language of Texas Penal Code section 19.02(b). And the first section of the application paragraph, the section that allows the jury to convict a defendant, also included this language:

> Now, if you find from the evidence beyond a reasonable doubt that the Defendant, Tareq Alkayyali, on or about the 28th day of May, 2019, in County of Tarrant, State of Texas, did then and there intentionally of knowingly cause the death of an individual, Wasam Moussa, by impeding the normal breathing or circulation of the blood of Wasam Moussa by applying pressure to her throat or neck with his hand or arm or by blocking her nose or mouth with his hand or hands. . .

But the second section of the application paragraph omitted the element "causes the death of":

> or if you find from the evidence beyond a reasonable doubt that the Defendant, Tareq Alkayyali, on or about the 28th day of May, 2019, in the County of Tarrant, State of Texas, did then and there intentionally, with the intent to cause serious bodily injury to Wasam Moussa, commit an act clearly dangerous to human life, namely, by impeding the normal breathing or circulation of the blood of Wasam Moussa by applying pressure to her throat or neck with his hand or arm or by blocking her nose or mouth with his hand or hands, then you will find the Defendant guilty of the offense of murder.

As written, the jury charge authorized the jury to convict the defendant of murder without determining if his actions went beyond committing an act clearly dangerous to human life because the element "causes the death of" was missing from the application paragraph for that theory of

murder. If the jury believed Appellant's defense that he did not intend to cause Moussa's death, it would have been forced to move to the second paragraph. Applying the second paragraph, the jury's inquiry would be complete upon determining that Appellant's conduct was an act clearly dangerous to human life without deciding whether Appellant caused Moussa's death, essentially gutting Appellant's defensive theory. This factor weighs in favor of egregious harm.

Next, we consider the state of the evidence, including contested issues and the weight of the probative evidence.[44] Again, we agree with the court below that this factor weighs in favor of egregious harm.[45] The Court has held that a defendant suffers egregious harm when elements of an offense are disputed at trial and the jury is not required to find those elements to be proven beyond a reasonable doubt prior to convicting a defendant.[46] In *Sanchez*, the defendant was charged with official oppression, which includes the element "intentionally subjects another to sexual harassment."[47] "'[S]exual harassment' means unwelcome sexual advances, requests for sexual favors, or other verbal

---

[44] *Almanza*, 686 S.W.2d at 171.

[45] *Alkayyali*, 668 S.W.3d at 454.

[46] *Sanchez v. State*, 209 S.W.3d 117, 125 (Tex. Crim. App. 2006).

[47] *Id*. at 118 n.1; Tex. Penal Code Ann. § 39.03(a)(3).

or physical conduct of a sexual nature, submission to which is made a term or condition of a person's exercise or enjoyment of any right, privilege, power, or immunity, either explicitly or implicitly."[48]  The jury charge's definition for sexual harassment followed the same ambiguous terms that the statute utilizes.[49]  Because of this ambiguity, the jury charge did not clearly inform the jury that it had to find the defendant's sexual advances as well as his requests for sexual favors and other sexual conduct unwelcome in order to find him guilty.  The jury charge also failed to inform the jury that the defendant had to be aware that any of his sexual conduct was unwelcome.  The application paragraph did not ameliorate these deficiencies.[50]

There was conflicting evidence at trial in *Sanchez* on the elements of "sexual harassment."[51]  For example, there was evidence that the defendant frequently called the complainant at home and that one Board member was concerned about their relationship.[52]  Additional evidence indicated that the complainant spent a great deal of time in the

---

[48] Tex. Penal Code Ann. § 39.03(c).

[49] *Sanchez*, 209 S.W.3d at 122.

[50] *Id*.

[51] *Id.* at 122-23.

[52] *Id.* at 123.

defendant's office with the door closed.[53] Evidence was presented that the complainant followed the defendant around the office, even waiting for him outside of the men's restroom.[54] But there was also testimony that the defendant was heard telling the complainant that "he didn't need a shadow[.]"[55] Thus, there was contested evidence as to whether the defendant's conduct was of a sexual nature, or if it was, whether the defendant was aware it was and that it was unwelcome.[56] The jury charge authorized the jury to convict the defendant without the State proving at least two elements of the offense of official oppression beyond a reasonable doubt causing the defendant to suffer egregious harm.[57]

In this case, the cause of Moussa's death was a disputed element of murder under Section 19.02(b)(2). The first part of the application paragraph required the jury to determine beyond a reasonable doubt that Appellant had caused Moussa's death under one theory of murder. But the second part of the application paragraph did not. It authorized

---

[53] *Id.*

[54] *Id.*

[55] *Id*.

[56] *Id*. at 124.

[57] *Id*. at 125.

the jury to convict Appellant of murder without ever deciding whether he caused Moussa's death. In this way, the jury reading the charge could essentially disregard any of the evidence Appellant pointed to under his defensive theory that the murder had been an accident.

The State argues that the issue of causation was not seriously contested. It contends that Appellant effectively conceded the issue of causation because Appellant's testimony reflected acceptance of responsibility for Moussa's death and instead focused on whether he intended for her to die. We disagree. The record shows that Appellant developed evidence to undermine the State's evidence regarding not just his culpable mental state, but also Moussa's cause of death. And as the court of appeals stated, "[i]f even a single juror was persuaded that Moussa's health issues created enough reasonable doubt as to the cause of her death, then [Appellant] could not have been convicted of murder."[58]

Appellant's defensive theory largely focused on Moussa's heart condition and fainting episodes. During the direct examination of Appellant's sister, she testified to the fact that Moussa fainted at Appellant and Moussa's wedding. A relative and doctor attending the

---

[58] *Alkayyali*, 668 S.W.3d at 454.

wedding helped.  Appellant also testified about this incident.  Appellant stated that the doctor-relative encouraged Moussa to check-in with her heart surgeon.

Appellant also testified to an incident that occurred a few days after the wedding.  After Moussa complained of chest pains and shortness of breath, Appellant took her to the hospital.  Despite orders for emergency room management and lab evaluations, Moussa refused treatment and left the hospital against medical advice.  While we do not agree with the court of appeals that the cause of death was "hotly" contested, it is nevertheless clear from the record that the issue of causation was contested and not assumed as the State argues.  And because the cause-of-death element was not included in the application paragraph, this factor weighs in favor of egregious harm.

The third factor to consider—arguments of counsel—also relates to causation.  During opening statements, defense counsel informed the jury that Moussa had a history of fainting, that she had heart surgery at the age of eighteen, and that the repaired area was close to the area of the heart that can cause fainting.  So, from the onset, Appellant at least suggested Moussa's health issues might have caused her death.  However, the State points to defense counsel's closing argument when counsel stated Appellant would take back what happened that morning

if he could. According to the State, this is a statement of responsibility, or "but for" causation. We disagree.

While neither party directly argued Appellant could be convicted without a finding of causation, Appellant's counsel's argument combined challenges to both intent and causation. Specifically, Appellant argued that this was a terrible accident. We do not take this to mean Appellant conceded causation as the State suggests. The fact that Appellant repeatedly referenced Moussa's heart condition and fainting episodes during closing argument points to a challenge to the cause of the victim's death. While he argued that he did not knowingly or intentionally cause Moussa's death or that he did not intend to cause her serious bodily injury, by emphasizing her heart condition and her fainting episodes he also sought to cast doubt upon the cause of death as well. Indeed, Appellant focused on this by asking, during closing arguments, "[w]ho knows the extent of her heart problem?" He emphasized that the answer is "we don't know" because Moussa would not let anyone look at or treat her.

Furthermore, Appellant argued that he was not even reckless because it was not possible to predict that this event would even cause her death. Contrary to the State's contention, Appellant did not effectively concede the cause of death during the trial. At best,

Appellant's arguments were at least a mixed bag and, therefore, this factor is a wash on the question of whether there was egregious harm.

The other relevant record information also weighs in favor of determining that Appellant suffered egregious harm from the jury charge error. While Moussa's health issues were clearly a part of Appellant's defensive strategy, he contested several other issues as to causation. Dr. Fries testified that when a person is smothered, they can develop a foam or froth in the throat due to the diaphragm moving up and down trying to move air in the lungs. While Appellant did not provide expert testimony as to other causes for the foam or froth, he did suggest that chest compressions, which Moussa received, could have provided at least a reasonable explanation that was independent of smothering.

Appellant also cast doubt on asphyxia as the cause of Moussa's death by pointing to testimony that undercut such a finding. Dr. Fries testified that the common places where petechiae can be observed in cases of asphyxiation are the eyes, face, skin, and even some organs. However, petechiae were only observed under Moussa's scalp. He also testified that there was bruising on her neck but that the bruising did not extend to her muscles. Additionally, there was no damage to Moussa's hyoid bone nor any to the cartilage of her thyroid and larynx,

all of which are examined in cases of strangulation. While we do not suggest that the evidence establishing the murder was legally insufficient, it is enough to say in this case that the issue of the cause of death was contested. We agree with the court of appeals that under the *Almanza* factors, the omission of the cause of death element in the jury charge resulted in egregious harm.

## Conclusion

In this case, the application paragraph of the jury charge did not include the "causes the death of" element of murder under Section 19.02(b)(2) of the Texas Penal Code. As a result, the jury charge failed to require that the State prove every element of the offense of murder beyond a reasonable doubt. After reviewing the record, we agree with the court of appeals that Appellant suffered egregious harm in this case. Therefore, we affirm the judgment of the court below.

Delivered: May 7, 2025

Publish



# In the Court of Criminal Appeals of Texas

No. PD-0290-23

TAREQ ALKAYYALI, *Appellant*

v.

THE STATE OF TEXAS

On State's Petition for Discretionary Review
From the Second Court of Appeals
Tarrant County

YEARY, J., filed a concurring opinion in which SCHENCK, P.J., joined.

In separate paragraphs of a single count, the indictment in this case charged Appellant with the commission of murder under two theories. The first paragraph alleged that he intentionally or knowing caused death, consistent with Section 19.02(b)(1) of the Texas Penal

Code. TEX. PENAL CODE § 19.02(b)(1).[1] The second paragraph alleged that he murdered his victim when, while he was intending to cause her serious bodily injury, he committed an act clearly dangerous to human life. TEX. PENAL CODE § 19.02(b)(2). Unfortunately, the second paragraph neglected to also allege that the act clearly dangerous to human life in fact *caused* the victim's death, as required by Section 19.02(b)(2) in order to constitute the offense of murder.[2]

In the trial court's charge to the jury, the abstract description of murder under Section 19.02(b)(2) was properly laid out in the definitions portion of the jury charge, including the caused-death element. But, as in the second paragraph of the indictment, that element was omitted from the application paragraph of the jury charge. Thus, the jury was authorized by the application paragraph of the charge to convict Appellant of murder—at least under the Section 19.02(b)(2) theory of murder—without ever making the elemental determination that he did in fact cause his victim's death. Appellant did not object to either the indictment or the jury charge based on this serious omission.

On appeal, Appellant argued that the jury charge was erroneous in this respect. Because he had failed to object at trial, however, he conceded that, consistent with Article 36.19 of the Texas Code of Criminal Procedure and this Court's opinion in *Almanza*, before he could

---

[1] Under Section 19.02(b)(1), "[a] person commits an offense if he . . . intentionally or knowingly *causes the death* of an individual[.]" TEX. PENAL CODE § 19.02(b)(1) (emphasis added).

[2] Under Section 19.02(b)(2), "[a] person commits an offense if he . . . intends to cause serious bodily injury and commits an act clearly dangerous to human life that *causes the death* of an individual[.]" TEX. PENAL CODE § 19.02(b)(2) (emphasis added).

obtain relief on appeal, he would have to demonstrate that the record reflected "egregious harm." TEX. CODE CRIM. PROC. art. 36.19; *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g.).[3] He argued that the record did, in fact, reflect that he suffered egregious harm because causation was contested at trial and the omission of that element from the application paragraph permitted the jury to convict him without ever resolving that contested elemental issue. The court of appeals agreed, concluding that Appellant was egregiously harmed because the State was relieved of its burden to establish a necessary element of the offense, which undermined Appellant's "right to present a complete defense that sought to question . . . causation." *Alkayyali v. State*, 668 S.W.3d 445, 455 (Tex. App.—Ft. Worth 2023). Today the plurality opinion affirms that judgment, and I concur.

### I. ACTUAL, NOT JUST THEORETICAL, HARM?

The Court has said that "egregious harm must be based on actual harm rather than a finding of theoretical harm." *See* Plurality Opinion at 17 (citing *Alcoser v. State*, 663 S.W.3d 160, 165 (Tex. Crim. App. 2022)). On petition for discretionary review, the State Prosecuting Attorney [SPA] argues that there is no egregious harm because, among other things, "Appellant's chief defensive theory focused on a lack of criminal mental state rather than causation." *Id*. at 15. The SPA's thesis seems to be that the thrust of Appellant's defense was to challenge, not

---

[3] "[T]he actual degree of harm must be assayed in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." *Almanza*, 686 S.W.2d at 171 (op. on reh.).

*causation*, but that it was ever his *intention* to cause the victim's death, as required for a conviction under Section 19.02(b)(1)—*intentionally or knowingly* causing death. The SPA contends that Appellant was not seriously challenging that he *did*, in fact, *cause* the victim's death (or that he was at least a but/for cause). In addition, the SPA argues that "the evidence does not show a viable causation argument[.]" *Id.*

But even if that is an accurate assessment of the record, it remains the case that jury deliberations could have been adversely impacted by the error in the jury charge. Because a jury verdict is "general," by statute, TEX. CODE CRIM. PROC. art. 37.07 § 1(a), we can only speculate under which theory the jury might have found Appellant guilty of murder. It is certainly possible that the jury was conflicted on the issue of Appellant's *intent* to cause death, given the defensive posture on that issue. If so, then the jury might have sought a way to convict Appellant that would avoid having to resolve that *mens rea* conflict. Under those circumstances, the jury might have seized upon the alternative theory of murder under Section 19.02(b)(2), which only requires an intent to cause serious bodily injury, not necessarily an intent to cause death. If the jurors (or even just *some* of the jurors) did convict Appellant under *that* theory of the offense, they might well have been misled by the faulty application paragraph into convicting Appellant without ever passing on the question of whether he caused the victim's death. If so, then Appellant has indeed suffered a very real violation of his due process right to have his chosen factfinder, here the jury, pass on every element necessary to justify a conviction.

Both Section 19.02(b)(1) and Section 19.02(b)(2) require a finding that the defendant *caused* the victim's death. The application paragraph did not require the jury to agree on which of the two statutory theories it found Appellant guilty under. Those jurors who believed Appellant to be guilty under Section 19.02(b)(1) would have found the elemental fact of causation. Meanwhile, those jurors who might have declined to find him guilty under Section 19.02(b)(1)—perhaps because they had doubts that Appellant had *intended* to cause that result, given the state of the evidence—may have opted to find Appellant guilty under Section 19.02(b)(2) instead. But, because the application paragraph left out the Section 19.02(b)(2) causation element, those latter jurors could well have convicted Appellant without ever making a finding that Appellant caused the victim's death.[4]

Causation being an element that was common to both theories of murder, the jurors were required to unanimously find it regardless of which theory they relied upon. *See Ramos v. Louisiana*, 590 U.S. 83, 93 (2020) ("There can be no question . . . that the Sixth Amendment's unanimity requirement applies to state and federal criminal trials equally."). But because some of the jurors may well have convicted Appellant under the flawed application of Section 19.02(b)(2), and thus failed to pass on the causation element, there is every chance that this jury verdict lacked unanimity—at least with respect to that common

---

[4] The plurality seems to make essentially this same argument in the course of its analysis of the first *Almanza* factor, which addresses the entirety of the jury charge. *See* Plurality Opinion at 21−22 (observing that the jury might have rejected the State's first theory of murder in the application paragraph based upon a lack of intent, and, proceeding to the second theory, it might have convicted Appellant without passing on the issue of causation).

element. This constitutes more than just theoretical harm for *Almanza* purposes.

## II. WAIVER-ONLY, STRUCTURAL ERROR?

A jury charge that altogether fails to require the jury to find every constituent element of the offense beyond a reasonable doubt should be considered, I have elsewhere urged, to be both "waiver-only" and "structural," and thus not subject either to procedural default or to *Almanza*'s egregious harm standard as a predicate to reversal. *Niles v. State*, 555 S.W.3d 562, 577–78 (Tex. Crim. App. 2018) (Yeary, J., dissenting); *Do v. State*, 634 S.W.3d 883, 908 (Tex. Crim. App. 2021) (Yeary, J., dissenting). As far as I am concerned, a defendant should be found to have suffered reversible error anytime he is convicted based upon a jury charge that authorizes the jury to convict him without first finding every constituent element of the charged offense.

As I indicated in my dissent in *Niles*, on this issue I agree with the late Justice Scalia:

> The underlying theme of the [Supreme] Court's opinion [in *Neder*] is that taking the element of materiality from the jury did not render Neder's trial unfair, because the judge certainly reached the 'right' result. But the same could be said of a directed verdict against the defendant—which would be *per se* reversible *no matter how overwhelming the unfavorable evidence.* * * * The very premise of structural-error review is that even convictions reflecting the "right" result are reversed for the sake of protecting a basic right. * * * Harmless-error review applies only when the jury *actually renders* a verdict—that is, when it has found the defendant guilty of all the elements of a crime.

*Niles*, 555 S.W.3d at 577 n.13 (Tex. Crim. App. 2018) (Yeary, J., dissenting) (quoting *Neder v. United States*, 527 U.S. 1, at 34, 38 (1999)

(Scalia, J., dissenting)). Like Justice Scalia, I do not believe we can deprive a defendant of his right to a jury assessment of every element of the offense simply because we believe we can safely assume what the jury *would* have done had it been correctly instructed.

Moreover, in my view, the fact that the Supreme Court would not regard this type of error to be "structural" should not prevent this Court from concluding, as a matter of construing our state constitution, that it is not subject to a harm analysis. As I observed in *Niles*:

> Unlike the Sixth Amendment, Article I, Section 15, of the Texas Constitution proclaims that "[t]he right of trial by jury shall remain inviolate." [TEX. CONST. art. I, § 15.] There is ample room for argument that the failure of the jury to render a verdict that passed on every element necessary to constitute the offense that is reflected in the judgment is "structural" error for state constitutional purposes, and not subject to a harm analysis at all.

*Id.* at 577. *See also Lake v. State*, 532 S.W.3d 408, 419 (Tex. Crim. App. 2017) (Yeary, J., concurring) ("I am not inclined to straightjacket our construction of [the harmless error rule] as the plurality continues to do today, in derogation of this Court's authority to, for example, declare certain *state* constitutional violations to be immune to harm analysis[.]"). In my view, "[t]he deprivation of" the right to a jury assessment of every element of an offense, "with consequences that are necessarily unquantifiable and indeterminate, unquestionably qualifies as 'structural error.'" *Sullivan v. Louisiana*, 508 U.S. 275, 281−82 (1993). When a jury charge altogether fails to require a jury to find one of the elements of the offense before convicting, I would simply reverse the conviction and order a new trial.

But the jury charge in this case did not *altogether* fail to require the jury to find causation as a predicate to conviction. If the jurors uniformly proceeded on the first theory of murder as presented in the application paragraph, then Appellant has suffered no deprivation of his right to a jury trial. That the jury verdict must be general, however, means we cannot know for sure this was the case, and the chance remains that the jury—or at least some of the jurors—voted to convict Appellant without first deciding whether he actually caused the victim's death. Under those circumstances, I am less sure than in *Niles* and *Do* that the error is either "waiver-only" or "structural," such that an *Almanza* analysis for egregious harm ought not to apply. *See Bell v. State*, 635 S.W.3d 641, 648 (Tex. Crim. App. 2021) (Slaughter, J., concurring, in which Yeary, J., joined) (concluding that an *Almanza* analysis applied because "[n]othing is 'missing' from the charge entirely, as was the case in *Niles*."). But I need not ultimately resolve that question because, in any event, I agree with the plurality's conclusion that Appellant has demonstrated egregious harm under *Almanza*.

### III. EGREGIOUS HARM?

I have already argued that the harm in this case was more than theoretical. Judge Parker's dissent makes a number of arguments why in its view the jury charge defect was nevertheless not harmful by *any* legal metric, much less by *Almanza*'s egregious harm standard. *See* Dissenting Opinion at 43−45 (summarizing arguments).[5] First, the dissent argues that the jury charge, taken as a whole, would have

---

[5] Although both Judge Parker and Judge Finley have dissents in this case, all references to "the dissent" or "Dissenting Opinion" hereafter in this opinion refer to Judge Parker's.

adequately directed the jury to a conclusion that it had to find that Appellant caused the victim's death—even absent such an express requirement in the Section 19.02(b)(2) portion of the application paragraph. *Id.* at 5–15. Second, the dissent maintains that, notwithstanding the defect in the application paragraph with respect to the Section 19.02(b)(2) theory of murder, it is possible to say from what the application paragraph *did* require the jury to find, under the particular facts of *this* case, that Appellant's jury essentially *did* make the requisite finding of causation, rendering the defect utterly harmless. *Id.* at 20–30. For the following reasons, I am unpersuaded.

### A. The Jury Charge as a Whole

The dissent identifies various aspects of the jury charge as a whole that it believes would have steered the jurors in the direction of finding causation under the Section 19.02(b)(2) theory of murder despite the lack of such an express requirement in the application paragraph. In my view, however, there are many aspects of the jury charge as a whole—including some the dissent relies upon—that seem likely to have caused the jury to focus on the application paragraph, which did *not* include a causation finding before authorizing the jury to convict Appellant of murder. I will address the dissent's arguments seriatim.

> **First: The abstract instruction's definition of murder was "prominent and easy to read, and it clearly required proof of causation[,]" while the "difficult" application paragraph gave the jury "a strong incentive to focus on and defer to the abstract murder paragraph."** Dissenting Opinion at 5–9.

I disagree. The abstract definition of murder was no more "prominent" in the jury charge than the application paragraph; in fact,

it was arguably less so. The abstract definition appears on a page of the jury charge that also includes five other definitional paragraphs. The application paragraph, by contrast, appeared on a separate page all by itself. That discrete placement was appropriate because "that paragraph specifies the factual circumstances under which the jury should convict or acquit," and as such, "it is the 'heart and soul' of the jury charge." *Vasquez v. State*, 389 S.W.3d 361, 367 (Tex. Crim. App. 2012).[6]

While it is not as grammatically simple—and therefore may not have been as "clear"—as the abstract definition, the application paragraph here is not impossibly obscure; grammatically speaking, it is perfectly navigable.[7] It makes no express reference back to the abstract

___

[6] The Court has said that an abstract jury instruction that fails to tailor culpable-mental-state definitions to the particular charged offense constitutes error. *E.g.*, *Cook v. State*, 884 S.W.2d 485, 491 (Tex. Crim. App. 1994) ("It is error for a trial judge to not limit the definitions of the culpable mental states as they relate to the conduct elements in the particular offense."); *Alvarado v. State*, 704 S.W.2d 36 (Tex. Crim. App. 1985) (trial court erred in failing to limit culpable mental state definitions to those which relate to result-of-conduct offense on trial). Still, the Court has also said that the harm stemming from jury charge error caused by an overly-broad abstract legal culpable-mental-state definition can be ameliorated by an application paragraph that explicitly limits the jury's consideration to the applicable aspects of the broader law. *E.g.*, *Campbell v. State*, 664 S.W.3d 240, 247 (Tex. Crim. App. 2022) (observing that "the application portion of the charge limited the harmful effect of the erroneous culpable mental state definitions in the abstract portion"). The logic is understandable, given that the application paragraph is the operative portion of the jury charge, describing for the jury how to apply the law to the specific facts of the case. I am doubtful, however, that the *reverse* proposition is true: that a legally erroneous application paragraph can be saved by an abstract definition that sets out the appropriate scope of the applicable law.

[7] The dissent goes so far as to conclude that the application "paragraph/sentence" is so grammatically complex that the jury might even have concluded "that the causation element appearing in the first 'if' clause applies to the entire sentence." Dissenting Opinion at 8−9. Given the "; or" that

definition, such as to incorporate by reference the causation element from that definition into the post-semicolon application paragraph itself. *See id.* (observing that "if the application paragraph necessarily and unambiguously refers to another paragraph of the jury charge, then a conviction is authorized").[8] And it manifestly failed, on its own terms, to require the jury expressly to find that Appellant's conduct in fact caused the victim's death as a prerequisite to conviction.

> **Second: The jurors did not need a formal application paragraph to know that a causation requirement was required with respect to the Section 19.02(b)(2) theory of murder.** Dissenting Opinion at 9–10.

Next, the dissent proceeds to construct a sort of alternative application paragraph that it believes the jury might have used. Dissenting Opinion at 9–10. This would involve combining the abstract definition of Section 19.02(b)(2) murder with the general instruction that a failure of proof on the State's part with respect to *any* element requires the jury to acquit. *Id.* Of course, if it were reasonable to assume

---

separates the two application-paragraph clauses, however, I do not understand how such a misreading would be possible. Whatever else might be said about the relative clarity of the application "paragraph/sentence," it *clearly* sets out two independent theories of murder for the jury to choose between, and only the first of the two expressly requires the jury to find that Appellant caused the victim's death.

[8] The dissent asserts that it would be "natural" for the jury "to assume that an element that clearly appears in the easy-to-read passage [i.e., the abstract definition] must be somewhere in the more-difficult-to-read counterpart passage [i.e., the application paragraph]." Dissenting Opinion at 8. Well, so much for the requirement that the application paragraph at least refer back to the abstract definition before it may be understood to incorporate the law as set out there—however "clearly"! If it were truly so "natural" for the jury "to assume" such an incorporation of earlier provisions in the jury charge, the requirement of an express reference back would seem superfluous.

a jury could formulate its own application paragraph in this way, there would simply be no need for the trial court to give a formal application paragraph specifically instructing the jury *how* to apply "the pertinent penal law, abstract definitions, and general legal principles to the particular facts and the indictment allegations." *Vasquez*, 389 S.W.3d at 366.[9] The dissent once again essentially rejects the efficacy and critical importance of the application paragraph altogether in assessing harm. *See* note 8, *ante*.

> **Third: The jury was told not to favor any particular instruction over any other, and that would have caused the jury to "harmonize" the abstract definition with the application paragraph by reading the latter to require a finding of causation.** Dissenting Opinion at 10−11.

The jury charge also instructed the jury, as the dissent next points out, that "[y]ou have no right to disregard or give special attention to any one instruction, or to question the wisdom or correctness of any

---

[9] For better or worse, the convention that jury charges contain not only abstract "law applicable to the case," but also application-of-law-to-fact paragraphs, seems to have derived from statutory language that has remained extant in successive codes of criminal procedure in Texas since the 1856 "Old Code" (O.C. art. 594). It may presently be found in Article 36.14: The trial court "shall . . . deliver to the jury . . . a written charge distinctly setting forth the law applicable to the case[.]" TEX. CODE CRIM. PROC. art. 36.14. It has long been said in view of this statutory language—whether justifiably or not—that jury charges that omit *application paragraphs* are erroneous. *See* TEXAS CRIMINAL PATTERN JURY CHARGES: GENERAL, EVIDENTIARY & ANCILLARY INSTRUCTIONS (2018 ed.) at 4−5 (citing *Gray v. State*, 152 S.W.3d 125, 127−28 (Tex. Crim. App. 2004)). Perhaps the cases have relied upon this statutory language to exaggerate the indispensability of application paragraphs. But once a trial court decides to *include* an application paragraph in the jury charge, it should at least *accurately* guide the jury's efforts in making the determination of guilt or innocence.

rule I may state to you." Dissenting Opinion at 11. The jury would have violated this instruction, the dissent avers, to have "disregarded the abstract paragraph or [given] special attention to the application paragraph." *Id.* But the whole problem here is that the abstract definition *conflicts* with the application paragraph; in order to give effect to either one, the jury would have to "disregard or give special attention" to the other. The net result is confusion, not clarity. And, because of the general verdict, we cannot know how the jurors likely resolved the conflict, if they even perceived it.

> **Fourth: Every other application paragraph required a finding of causation, so the jury must have realized that causation was likewise required to convict Appellant of murder under the Section 19.02(b)(2) portion of the murder application paragraph.** Dissenting Opinion at 11−12.

This next circumstance can also cut both ways. That every *other* application paragraph contained an explicit causation requirement could have been the very thing that convinced the jury that there was *no* comparable causation requirement to convict Appellant under the Section 19.02(b)(2) theory of murder. Obviously, the trial court knew how to include a causation requirement, because it did so with respect to every *other* application paragraph in the jury charge. The conspicuous absence of such a requirement in the second half of the murder application paragraph must—the jury might well have reasoned—have been deliberate.

> **Fifth: The State *told* the jury during voir dire that the State would have to prove causation with respect to Section 19.02(b)(2) murder.** Dissenting Opinion at 12−13.

It is true that the prosecutor made a couple of allusions during voir dire to the fact that the indictment's Section 19.02(b)(2) theory of murder would require evidence that the victim had, in fact, "died." Dissenting Opinion at 12. But a jury that was looking for a way to convict Appellant for murder despite harboring some doubt whether he intended to cause the victim's death, under the Section 19.02(b)(1) portion of the application paragraph, might have alit upon the Section 19.02(b)(2) portion of that paragraph and perceived it to be a way of avoiding the intent issue. As it happens, that portion of the application paragraph also relieved them of the obligation to resolve the causation issue. Eager to convict Appellant one way or another, some jurors might have jumped at the chance to convict Appellant under this theory having forgotten the prosecutor's voir dire tutorial.

In any event, the jury charge also informed the jury that "[w]hat the lawyers say is not binding upon you." While that paragraph of the jury charge pertained to issues of fact, not law, it remains the case that whatever the attorneys may have said about the law was trumped by the jury charge. And even if the prosecutor was right and the trial court was wrong, the jury was told that the trial court is the exclusive and all-knowing source of the law to be applied. For this reason, during their deliberations, the jurors might have disregarded the prosecutor's voir dire assertions about the law in favor of the Section 19.02(b)(2) portion of the murder application paragraph.

> **Sixth: "Causation is a widely understood element of murder"—apparently by *any* theory of murder.** Dissenting Opinion at 13−14.

> The trial court judge informed the jury right off the bat that "[i]t

is my duty at the end of the trial to explain to you the rules of law that you must follow and apply in arriving at your verdict." Shortly after, he reiterated: "You must not substitute or follow your own notion or opinion as to what the law is or ought to be. It is your duty to apply the law as I explain it to you, regardless of the consequences." Finally, at the conclusion of his jury instructions, the trial court admonished: "[Y]ou are bound to receive the law from the Court, which is herein given, and be governed thereby." None of these admonishments would have encouraged the jurors to believe that they could resort to the print, broadcast, or social media sources that the dissent invokes to inform it of the circumstances justifying conviction—quite the opposite.

That the dissent should resort to such sources as part of its harm analysis seems anomalous and anti-systemic to me. I do not think jurors necessarily expect their jury service to jibe with representations of the criminal justice system that they encounter in the media. Most jurors, for instance, are unaware—media sources notwithstanding—that defendants may be convicted of murder under the law of parties without personally committing the act that results in the victim's death. *See* TEX. PENAL CODE § 7.02(a)(2), (b) (authorizing conviction for, respectively, "soliciting, encouraging," etc., others to commit an offense, with the requisite intent, or engaging in a conspiracy in which it is foreseeable that a co-conspirator would commit a different offense). Some jurors might be shocked and dismayed to be so informed by a trial court's jury charge. Notwithstanding their shock, they would still be bound to follow the law as given, even if the popular media had not prepared them to anticipate such a consequence.

For all we know, that is what happened here. The jurors in this case (or some of them) might have considered the Section 19.02(b)(2) portion of the murder application paragraph to represent some kind of a transferred-intent or transferred-causation theory of murder—as unexpected and alien to the average juror, perhaps, as a Section 7.02 parties-liability instruction. So long as it could find that Appellant intentionally committed an act clearly dangerous to human life, the jury might have believed it was being told, it could convict him of "murder" regardless of the result. Counter-intuitive, perhaps, but that is why trial courts give binding jury instructions in the first place: because jurors cannot be expected to understand certain nuances of the law, regardless of—or perhaps even *because* of—their exposure to the popular media.

> **Seventh: Had the jury even noticed the absence of a causation requirement in the Section 19.02(b)(2) portion of the application paragraph, it would have realized that this was a "problem" and sought clarification from the trial court.** Dissenting Opinion at 14−15.

This argument presupposes that the jurors would have snapped to the inconsistency between the Section 19.02(b)(2) portion of the application paragraph and the abstract definition. At this juncture, we cannot know for sure that they did. And *if* they did, we cannot know for sure that they did not simply regard the application paragraph as the ultimate and authoritative statement of what they had to find to convict Appellant, and that they saw no need for trial court clarification.[10]

---

[10] In a similar vein, the dissent argues that if it had not in fact found causation at the guilt phase of trial, the jury would surely have raised a ruckus at the punishment phase when the instruction on sudden passion was given, since that instruction presupposes a finding of causation. Dissenting Opinion

In summary, the dissent fails to persuade me that the court of appeals erred to conclude that this defect in the application paragraph "deprived [Appellant] of his right to due process and affected his main defensive theory by . . . relieving the State of its high burden" to prove Appellant caused the victim's death—at all, much less to convince the jury to find that elemental fact unanimously and beyond a reasonable doubt. *Alkayyali*, 668 S.W.3d at 455.

## B. The Jury Essentially *Did* Find Causation

For roughly the latter half of its opinion, the dissent argues that even if the jury (or some jurors) proceeded under the Section 19.02(b)(2) portion of the murder application paragraph, it (or they) essentially *did* make the requisite causation finding. Dissenting Opinion at 20−30. Given the elements the jury *was* required to resolve, and the facts of this case, the dissent maintains, the jury effectively would have found causation, if only by necessary implication. *Id*. The argument is lengthy, complex, and (to me, at least) convoluted. Indeed, the jury (or jurors) could not possibly have been *aware* that it (or they) were making such a finding, assuming the dissent is correct that it (or they) in fact actually *did* make it. Again, I am unpersuaded.

If I understand the dissent's argument correctly, it ultimately concludes that the jury necessarily found causation based on the

---

at 33−36. But by that time the jury's attention was focused on the sudden passion issue, which had nothing to do with causation and everything to do with Appellant's state of mind at the time of the offense. There is no particular reason to expect the jury to have sent out a note at that juncture with respect to the guilt-phase issue of causation.

premise (among others) that "[n]o one disputes that the victim died."[11] Dissenting Opinion at 25. The problem is that the jury was authorized to convict Appellant under the Section 19.02(b)(2) portion of the application paragraph without ever having to pass on this fact, undisputed though it may have been. If the jury (or some jurors) did not have to decide whether the victim in fact *died*, it (or they) would not have decided—even if it (or they) *could* have, according to the dissent's elaborate logic—that Appellant's conduct *caused* that death.

Without an explicit instruction that it must find that Appellant's conduct in fact "cause[d] the *death*" of the victim as a predicate to conviction, TEX. PENAL CODE § 19.02(b)(2), I do not think it is possible to infer (much less, *necessarily* infer) that the jury (or some jurors) passed on the issue of death as the necessary result, or Appellant's causation of that result. And if it (or they) voted to convict Appellant without making those findings (as was eminently possible given the record in this case), then Appellant's due process rights were violated and he suffered

---

[11] Another of the dissent's premises seems to be that "impeding" normal breath or blood circulation—the "act clearly dangerous to human life" alleged in the indictment and included in the Section 19.02(b)(2) portion of the murder application paragraph—constitutes the "injury" for purpose of assessing the "serious bodily injury" that Appellant intended. Dissenting Opinion at 25−26. For that proposition, the dissent cites *Ortiz v. State*, 623 S.W.3d 804, 807 (Tex. Crim. App. 2021). *Id*. at 25 n.43. I would only note in this context that I have rejected the notion that impediment of *breath*, without more, constitutes "bodily injury" *per se. Marshall v. State*, 479 S.W.3 840, 846−49 (Tex. Crim. App. 2016) (Yeary, J., concurring and dissenting); *Ortiz*, 623 S.W.3d at 812−13 n.2 (Yeary, J., concurring and dissenting); *see also Price v. State*, 457 S.W.3d 437, 444 (Tex. Crim. App. 2015) (Yeary, J., concurring) ("To me, impeding the breath or circulation sounds a lot more like the description of a *type* of conduct than the description of a particular *result* of conduct.").

egregious harm under *Almanza*.[12]

## IV. CONCLUSION

For these reasons, I concur in the plurality's judgment affirming the judgment of the court of appeals.

**FILED:**                                                     May 7, 2025
**PUBLISH**

---

[12] Less than a year after he authored the Court's opinion on rehearing in *Almanza*, Judge Sam Houston Clinton had this to say, albeit in dissent, about the proper implementation of its "egregious harm" standard:

> Let it be clearly understood that an egregious error must first be found before an appellate court takes the next step . . . to review any other pertinent part of the record for actual harm. But obviously there are some errors so egregious that such a review will not save them. Nowhere in *Almanza* did we say, "This Court no longer recognizes per se reversible jury charge error," as intimated in the majority opinion.

*Lawrence v. State*, 700 S.W.2d 208, 218 (Tex. Crim. App. 1985) (Clinton, J., dissenting). *Lawrence* was a case, like this one, in which the jury charge had authorized the jury to convict the appellant of murder without first finding every element of that offense. Judge Clinton believed such an error in the jury charge would suffice in and of itself to establish egregious harm no matter what else a further examination of the record might reveal. I agree with him. As far as I am concerned, a defendant suffers egregious harm under *Almanza* anytime he is convicted based upon a jury charge that authorizes the jury to convict without finding all of the constituent elements of the charged offense.



# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

---

### NO. PD-0290-23

---

### TAREQ ALKAYYALI, Appellant

### v.

### THE STATE OF TEXAS

---

### ON STATE'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE SECOND COURT OF APPEALS
### TARRANT COUNTY

---

**FINLEY, J., filed a dissenting opinion.**

### <u>DISSENTING OPINION</u>

This case involves unobjected-to jury charge error. The jury instruction's application paragraph omitted the causation requirement for murder under Section 19.02(b)(2) of the Texas Penal Code. The jury convicted Appellant. The question presented is whether the unobjected-to jury charge error egregiously harmed Appellant. Today, the plurality opinion agrees with the court of

appeals and holds that Appellant was egregiously harmed. I disagree. Therefore, I respectfully dissent.

## I. Applicable Law

The jury charge's application paragraphs authorize a conviction. *Crenshaw v. State*, 378 S.W.3d 460, 466 (Tex. Crim. App. 2012) (first citing *Hutch v. State*, 922 S.W.2d 166, 172 (Tex. Crim. App. 1996); and then citing *Campbell v. State*, 910 S.W.2d 475, 477 (Tex. Crim. App. 1995)). They apply the "pertinent penal law, abstract definitions, and general legal principles to the particular facts and the indictment allegations." *Id.* When there is jury-charge error, regardless of whether the error occurs in the abstract or application paragraphs, the reviewing court must determine whether the error harmed the defendant. *Alcoser v. State*, 663 S.W.3d 160, 165 (Tex. Crim. App. 2022). The requisite level of harm depends upon whether the defendant objected to the jury charge at trial. *Id.* If there was a timely objection to the error, then "the record need only show 'some harm.'" *Id.* (quoting *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g)). If not, then "the record must show 'egregious harm.'" *Id.* (quoting *Almanza*, 686 S.W.2d at 171).

Egregious harm requires more than some theoretical harm. *See id.* Rather, an appellant must be actually harmed by the erroneous jury charge.

*See id.* "An erroneous jury charge is egregiously harmful if it affects the very basis of the case, deprives the accused of a valuable right, or vitally affects a defensive theory." *Id.* (citing *Almanza*, 686 S.W.2d at 171). Determining whether the defendant was egregiously harmed requires a fact-specific analysis, and it is challenging to satisfy. *See id.* Our analysis is guided by considering four factors: "(1) the entirety of the jury charge, (2) the state of the evidence, including the contested issues and weight of probative evidence, (3) the arguments of counsel, and (4) any other relevant information revealed by the trial record as a whole." *Villarreal v. State*, 453 S.W.3d 429, 433 (Tex. Crim. App. 2015) (citing *Almanza*, 686 S.W.2d at 171).

## II. Analysis

As discussed below, I believe the first *Almanza* factor weighs in favor of egregious harm; the second factor is neutral; the third factor weighs in favor of no harm; and the fourth factor weighs neither in favor of nor against harm, because the first three factors consider all the relevant trial information. Considered in their totality, Appellant did not suffer egregious harm.

### a. The entirety of the jury charge.

Except for omitting the causation element at issue from the application paragraph, the jury charge was correct. Pertinent to Appellant's case are the differences between subsections (b)(1) and (b)(2) for murder under Texas Penal

Code Section 19.02. A person commits murder under subsection (b)(1) by "intentionally or knowingly caus[ing] the death of an individual." TEX. PENAL CODE § 19.02(b)(1). A person commits murder under subsection (b)(2) if he "intends to cause serious bodily injury and commits an act clearly dangerous to human life that *causes* the death of an individual." *Id.* § 19.02(b)(2) (emphasis added). The indictment alleged both subsections as alternate murder theories. Like the application paragraph, the indictment failed to include the causation requirement for subsection (b)(2) murder, but did include the causation requirement for subsection (b)(1) murder. And yet, the jury charge's abstract paragraphs correctly defined murder under both subsections. Thus, only the indictment and the application paragraph for the subsection (b)(2) murder offense omitted the causation element.

Under these circumstances, it is reasonable for the jury to have come to one of two conclusions about the subsection (b)(2) murder charge: (1) the abstract paragraph was incorrect, or (2) the application paragraph was incorrect. Faced with this inconsistency, the jury would have been further guided by the indictment, which shared the same defect as the application paragraph. The plurality opinion is correct in noting that "[t]he application paragraph is the 'heart and soul' of the jury charge because it 'specifies the factual circumstances under which the jury should convict or acquit.'" Op. of

Newell, J., at 19 (quoting *Vasquez v. State*, 389 S.W.3d 361, 366 (Tex. Crim. App. 2012)). Because the application paragraph applies the law to the facts of the actual case and crime before the jury, it makes intuitive sense for the jury to discredit the abstract in favor of the application paragraph, especially when it mirrors the indictment's language. Therefore, this factor weighs in favor of a finding of egregious harm.

### b. The state of the evidence, including the contested issues and weight of the probative evidence.

As demonstrated by the court of appeals, there was legally sufficient evidence to affirm Appellant's conviction for murdering Moussa. *Alkayyali v. State*, 668 S.W.3d 445, 455–57 (Tex. App.—Fort Worth 2023). This weighs in favor of no harm for this specific *Almanza* factor.

The plurality opinion cites *Sanchez v. State*, 209 S.W.3d 117, 125 (Tex. Crim. App. 2006), for the proposition that "[t]he Court has held that a defendant suffers egregious harm when elements of an offense are disputed at trial and the jury is not required to find those elements to be proven beyond a reasonable doubt prior to convicting a defendant." Op. of Newell, J., at 22. However, I am unconvinced that omitting the causation element created a situation in which the jury "could essentially disregard any of the evidence Appellant pointed to under his defensive theory that the murder had been an accident." *Id.* at 25. Appellant's "accident defense" did not thrust causation into

issue. Nor does an accident necessarily implicate causation. An accident relates to a defendant's *mens rea*, which is a distinct inquiry from considering whether Appellant's conduct caused the death of Moussa.

Moreover, causation did not seem to be seriously disputed. Appellant centered his defensive theory around Moussa's heart condition and issues with fainting. But there was no evidence that Moussa's repaired ventricular septal defect (VSD) or fainting issues caused her death. In 2013, Moussa's VSD was surgically repaired. Moussa's VSD repair remained intact even after death. Dr. Krouse's autopsy report noted that the VSD abutted Moussa's heart's conduction system, and Dr. Fries explained that "every [VSD] is essentially abutting the conduction system." Dr. Fries further explained that fainting is not a symptom of a repaired VSD. In fact, Dr. Fries opined that he would expect syncope and fainting only if the VSD "was unrepaired and the person was in heart failure." Dr. Fries also noted that it would be unlikely for an unrepaired VSD to cause immediate death. Instead, it would lead to progressive and protracted heart failure. Dr. Fries even opined that the repaired VSD did not contribute to Moussa's death. Likewise, there was no evidence that fainting could have caused Moussa's death.

When considering Moussa's relevant medical history, neither health issue working independently or concurrently previously caused an injury even

remotely commensurate to death. It seems speculative, at best, to conclude that these health issues undercut the State's causation theory or put causation at issue. Thus, Moussa's medical history did not raise serious issues of causation, if any.

Yet the indictment and application paragraph matched and shared the same error—each omitted the causation element. It was reasonable for the jury to presume that the abstract paragraph contained the error, because it was unlike the indictment and application paragraph. This would tend to favor a finding of egregious harm because the jury may have disregarded the correct elements of subsection (b)(2) murder.

Finally, the plurality opinion considers the following three facts under *Almanza*'s fourth factor, *see* Op. of Newell, J., at 28–29, but they are relevant under *Almanza*'s second factor. I agree with the plurality opinion in that the following facts favor a finding of egregious harm: (1) "Dr. Fries testified that the common places where petechiae can be observed in cases of asphyxiation are the eyes, face, skin, and even some organs. However, petechiae were only observed under Moussa's scalp"; (2) Dr. Fries "also testified that there was bruising on her neck but that the bruising did not extend to her muscles"; and (3) "there was no damage to Moussa's hyoid bone nor any to the cartilage of her

thyroid and larynx, all of which are examined in cases of strangulation." *Id.* at 28–29. But the plurality opinion overstates their cumulative importance.

The petechiae being observed only under Moussa's scalp slightly undercuts the State's theory that Appellant suffocated Moussa to death. Yet its value remains slight because Dr. Fries also testified that petechiae can appear under an individual's scalp when the jugular vein is obstructed. This latter, alternative explanation requires a combination of smothering and strangulation or "some level of neck compression," which comports with the State's argument of how Appellant killed Moussa. *See infra* Section II.c.i. The bruising, or lack thereof, the lack of damage to Moussa's hyoid bone, and the lack of damage to the cartilage of Moussa's thyroid and larynx weigh in Appellant's favor because they provide some evidence that Moussa did not die by strangulation.

When the above facts are considered in their totality, I believe *Almanza*'s second factor is neutral.

### c. The arguments of counsel.

As discussed below, the arguments of counsel can be subdivided into the State's and defense counsel's. While the State's arguments favor a finding of no harm, defense counsel's arguments are neutral. Thus, this *Almanza* factor favors a finding of no harm.

i.    The State

The State's opening statement, as expected, provided a roadmap of the evidence it would present to the jury that would prove Appellant committed the murder. The opening statement was short and consumed a mere four pages of the trial's transcript. The State only discussed causation when it told the jury that it would hear from Dr. Fries, who would tell the jury that "the cause of death in this case was asphyxiation." But briefly stating the cause of death does not amount to a causation-based argument and does not weigh for or against egregious harm.

The State spent most of its opening argument discussing the circumstances surrounding Moussa's death because they were highly probative of Appellant's *mens rea* of intentionally or knowingly, either of which the State needed to prove to secure a murder conviction. The State discussed how Appellant smothered and strangled Moussa to death, which undercut Appellant's defense that their fight was over in seconds. This did not focus on causation. The State focused on negating Appellant's defense and establishing Appellant's *mens rea*.

The State, however, did spend the first third of its closing argument confronting causation. The State argued that nothing else besides Appellant's conduct could have caused Moussa's death. The State discounted Moussa's

VSD and fainting issues, and underscored Moussa's 2018 EKG that revealed no issues with her heart. The State urged the jury to accept its theory that Moussa had died because Appellant strangulated or suffocated her. Thus, the State spent some but not all of its closing argument on causation.

The State spent an insignificant amount of time on causation in its opening statement and closing arguments. Rather, the State devoted these key moments to persuading the jury to find that Appellant intentionally or knowingly killed Moussa, and that this was not an accident. This favors a finding of no harm.

ii.    Appellant

As the plurality opinion states, defense counsel's opening statement included "inform[ing] the jury that Moussa had a history of fainting, that she had heart surgery at the age of eighteen, and that the repaired area was close to the area of the heart that can cause fainting." Op. of Newell, J., at 26. However, these references to Moussa's heart condition and fainting episodes do not activate a causation-based defense. To conclude otherwise requires the reviewing court to overanalyze the arguments and pan for gold when there is none. Notably absent from defense counsel's statement is that a history of fainting and a repaired VSD caused Moussa's death.

Defense counsel's closing argument opened with "Tareq Alkayyali didn't mean for [Moussa] to die." It closed with defense counsel explaining why the jury should find that Appellant (1) "did not inten[tionally] or knowingly cause [Moussa's] death"; (2) was not reckless; and (3) did not commit criminally negligent homicide. The beginning and ending of defense counsel's closing argument focused on Appellant lacking any criminal *mens rea*. Absent from defense counsel's final remarks is an argument about why Appellant did not commit subsection (b)(2) murder.

The closest defense counsel came to outright contesting causation occurred when he argued for the jury to disbelieve now-discredited Dr. Krouse, who conducted Moussa's autopsy. Even though Dr. Fries independently reviewed Moussa's autopsy, it still served as the basis upon which he testified. Defense counsel questioned the veracity of Dr. Krouse's conclusion that Moussa's cause of death was a "homicide or death at the hands of another and asphyxia." Defense counsel urged the jury not to rely on the autopsy's stated cause of death. And yet, Appellant offered no expert testimony that Moussa died from fainting or her repaired VSD, or both. Moreover, Moussa's autopsy was peer reviewed by at least five other medical examiners. Besides highlighting Dr. Krouse's other flawed autopsies, defense counsel failed to substantively argue why Dr. Krouse's conclusion was incorrect. At best, this

implicitly argues to the jury that it should question causation. Viewed in totality, this portion of Appellant's closing argument does not indicate that Moussa's cause of death was seriously contested by defense counsel.

Because defense counsel's opening statement and closing argument do not directly or seriously contest causation, they are neutral in determining harm for this *Almanza* factor.

### d. Any other relevant information revealed by the record of the trial as a whole.

For Appellant, all the relevant information fits into one of the first three *Almanza* factors. Accordingly, the fourth factor is neutral and neither weighs for nor against a finding of egregious harm.

In summary, the first *Almanza* factor is the only one that weighs in favor of egregious harm; the second and fourth *Almanza* factors are neutral; and the third *Almanza* factor weighs in favor of no harm. Because the *Almanza* factors do not support a finding that Appellant suffered egregious harm, I would reverse the judgment of the court of appeals.

## III. Judge Parker's dissent.

I agree with Judge Parker's dissent to a certain degree. First, the plurality opinion incorrectly defined the legal issue, thereby reaching an incorrect conclusion. *See* Op. of Parker, J., at 1–2. Second, the plurality opinion relies on distinguishable precedent because Appellant's causation element was

not entirely omitted from the jury charge, and Appellant failed to object at trial. *See id.* at 2–5. Third, I largely agree with Part C of Judge Parker's dissent, which I interpret as a limited *Almanza* analysis. *See id.* at 20–30. But, for the reasons stated below, I do not agree with the other portions of Judge Parker's dissent.

To start, Judge Parker diminishes the jury charge's application paragraph's importance. The application paragraph applies the law to the facts and "specifies the factual circumstances under which the jury should convict or acquit." *Vasquez*, 389 S.W.3d at 366. Without it, the jury would not know whether to render an acquittal or a conviction. *See id.* It, therefore, functions as a guiding hand to the jury. Compared to the abstract paragraphs, the application paragraph will always be more difficult to read because it actually applies the law to the facts. The jury is certainly free to consult the abstract paragraphs for clarification purposes, but the abstract paragraphs are primarily aimed to "serve as a glossary to help the jury understand the meaning of concepts and terms used in the application paragraphs of the charge." *Crenshaw*, 378 S.W.3d at 466. While the jury may have focused on the abstract paragraphs, *see* Op. of Parker, J., at 5–9, the abstract did not authorize Appellant's conviction. The application paragraph did. Thus, the jury was entitled to defer to the application paragraph, even though the abstract

paragraph differed, *contra id.* at 11. *Cf. Patrick v. State*, 906 S.W.2d 481, 493 (Tex. Crim. App. 1995) ("We conclude that because the facts, as applied to the law in the application paragraph, pointed the jury to the appropriate portion of the definitions, no harm resulted from the court's failure to limit the definitions of culpable mental states[.]").

Next, in light of the indictment's shared error, the entirety of the jury charge does not alleviate the harm caused by the omitted causation element. The application paragraphs, except for Section 19.02(b)(2) murder, correctly instructed the jury under which scenarios it could render a guilty verdict. Judge Parker is correct in noting that "[a]ny juror recalling the lesser-included offense instruction would find it very odd for the second murder theory to be the only offense in the entire jury charge that did not require a showing that Appellant caused the victim's death." Op. of Parker, J., at 12. Yet the indictment also omitted the causation element. Because the State never included the causation element for Section 19.02(b)(2) murder, its omission in the application paragraph is not so odd. The jury could have reasonably assumed that the abstract murder paragraph was wrong, not the indictment and application paragraph. *See supra* Section I.a. This would also explain why the jury did not seek clarification on Section 19.02(b)(2) murder's application paragraph. *But see* Op. of Parker, J., at 14.

Finally, I am hesitant to rely upon the premise that "[c]ausation is a widely understood element of murder." *Id*. at 13. While this might be true, it opens Pandora's box. Not to belabor the point, but the application paragraph outlines the basis upon which a jury may convict a defendant. *See Vasquez*, 389 S.W.3d at 366. It should contain every element of an offense. Its failure to do so should not be rendered harmless partially because of society's increased interest in and consumption of murder-related media. It seems misguided to permit the entertainment industry to usurp the role of the jury charge's application paragraph. We should be hesitant before permitting outside sources to affect our jury-charge error analysis. If not, then some mysterious threshold level of media coverage could impute constructive knowledge of a crime's essential elements to the jury. At that point, where would we draw the line?

## IV. Conclusion

The jury-charge error in this case should not be repeated. My dissent is not intended to endorse the State's and defense counsel's failures. Both sides share some level of culpability. Moreover, I am hesitant to find egregious harm

in a situation like this because it may incentivize future defense attorneys to not object to similar jury charge errors.[1]

Had the error been objected to, I would join the plurality opinion. However, with the facts before the Court today, I do not conclude that Appellant suffered egregious harm. Because the plurality opinion holds otherwise, I respectfully dissent.

**Filed: May 7, 2025**
**Publish**

---

[1] The plurality opinion takes issue with this sentiment, *see* Op. of Newell, J., at 17 n.26, by misconstruing my hesitancy in finding egregious harm. It conveniently overlooks the *Almaza* analysis I conducted *supra* Part II and that I rely upon to conclude that Appellant did not suffer egregious harm. More importantly, the responsibility for timely and properly objecting to an erroneous jury charge falls upon the defendant or defense counsel. TEX. CODE CRIM. PROC. art. 36.14. ("Before said charge is read to the jury, the defendant or his counsel shall have a reasonable time to examine the same and he shall present his objections thereto in writing, distinctly specifying each ground of objection.").



# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. PD-0290-23

### TAREQ ALKAYYALI, Appellant

### v.

### THE STATE OF TEXAS

### ON STATE'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE SECOND COURT OF APPEALS
### TARRANT COUNTY

**PARKER, J., filed a dissenting opinion.**

## DISSENTING OPINION

The plurality opinion frames the question in this case as whether egregious harm occurs if

the jury charge "fails to require the State to prove every contested element of an offense beyond a

reasonable doubt." But that is not the correct question in this case. Here, the jury charge in fact

required the State to prove *every* element of the offense of murder beyond a reasonable doubt—in

abstract instructions. What the jury charge failed to do was include one of the elements—causing

death—for one of the theories of murder in an application paragraph. Because Appellant did not

object at trial, the question is whether this omission from the application paragraph resulted in egregious harm.[1]

And the answer to that question is a resounding "no." As the plurality opinion acknowledges, "egregious harm" is a difficult standard to meet.[2] The record must show actual and not merely theoretical harm, and the defendant is harmed only if he "did not receive a fair and impartial trial."[3] Two independent reasons exist for concluding that the record does not show egregious harm. First, given the abstract murder instruction, other jury instructions, the prosecutor's comments, what people generally know about the offense of murder, and the jury's failure to exhibit any confusion, the jury in this case must have known that the State had to prove that Appellant caused the victim's death. Second, even if the jury had limited itself to the application paragraph and the evidence—determining whether, at the time of the collapse that led to the victim's death, the defendant had intentionally engaged in strangulation or suffocation activity that created a substantial risk of death—the jury must have found causation anyway. In addition to those two reasons, the jury's punishment-stage note to the trial court about the "sudden passion" special issue further reinforces a conclusion that the jury must have found causation at the guilt stage. Any harm suffered by Appellant was at best theoretical, not actual, and we should affirm his conviction.

**A. <u>General Observations</u>: The cases the plurality relies upon are not on point and reflect an incorrect framing of the issue.**

---

[1] *See Reed v. State*, 680 S.W.3d 620, 625-26 (Tex. Crim. App. 2023); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g).

[2] *Sandoval v. State*, 665 S.W.3d 496, 528 (Tex. Crim. App. 2022) (quoting *Marshall v. State*, 479 S.W.3d 840, 843 (Tex. Crim. App. 2016)).

[3] *Reed*, 680 S.W.3d at 626.

To support its conclusion that the omission of an element causes egregious harm if the evidence on the element is contested, the plurality relies upon four Texas cases and indirectly relies upon two Supreme Court cases. In all but one of these cases, the element was *completely* omitted from the jury charge. In *Niles v. State*, the jury charge completely omitted any reference to the victims being public servants.[4] In *Ruiz v. State*, the abstract and application paragraphs for the offense of murder completely omitted the implied element of the absence of sudden passion, a mitigating element of the then-lesser-included offense of voluntary manslaughter.[5] In *Sanchez v. State*, this Court had construed the sexual harassment part of the official oppression statute to require that all acts of sexual harassment be "unwelcome," but the abstract and application paragraphs in the jury charge did not conform to that construction, so that the element of "unwelcome" was completely

[4] 555 S.W.3d 562, 567 (Tex. Crim. App. 2018) (regarding the missing "public servant" element: "Unfortunately, the jury charges did not ask the jury to determine whether Keelen and Haygood were public servants. Though there were separate written charges for each count, the judge read the two as a combined charge out loud. Neither the accusation nor the application paragraph included the public servant element. And the words 'public servant' do not appear anywhere in the middle of the charge.").

[5] 753 S.W.2d 681, 687 (Tex. Crim. App. 1988) ("However, it must be remembered that the charge omitted sudden passion as an element of murder. If the jury followed the law as set forth in the charge—as we must presume they did—they could quite reasonably have decided that they could convict appellant of murder without deciding, or even addressing, sudden passion."). *See also id.* at 682 & n.1 (setting out abstract and application instructions on murder and voluntary manslaughter). Although the voluntary-manslaughter instructions contained the element of sudden passion, the jury instructions required the jury to decide the issue of murder before getting to voluntary manslaughter, so the jury would never have to reach the issue of sudden passion. *See id.* at 682, 687. Despite what it saw as the complete omission of the implied element of lack of sudden passion, the Court also pointed to the other facts tending to show harm: that the jury initially returned a verdict on voluntary manslaughter (which did not hold up under jury polling), that the jury later sent a note asking about the relationship between murder and voluntary manslaughter (which the trial court answered by merely referring the jury to the charge), and that the evidence of sudden passion was "substantial." *See id.* at 685-86.

omitted for certain methods of committing the offense.[6] In *Apprendi v. New Jersey*, the hate-crime enhancer was a punishment issue to be decided by the trial court and thus not subject to being submitted to the jury.[7] And in *Neder v. United States*, the element of "materiality" was decided by the trial court and not submitted to the jury.[8] All of these cases addressed the *complete* omission of an offense element from the jury charge and, therefore, differ dramatically from the present case.[9]

The case the Court relies upon that does not involve the complete omission of an element, *MacDougall v. State*, involved the complete omission of a definition.[10] The Court nevertheless suggests that *MacDougall* is analogous to the present case. But, in *MacDougall*, the error was *preserved*, and the error was evaluated under the "some harm" standard for preserved error, not the

---

[6] 209 S.W.3d 117, 122 (Tex. Crim. App. 2006) ("The jury charge abstractly defined sexual harassment in the same ambiguous terms that the statute utilizes. Thus, it did not clearly inform the jury that it must find that, not only the appellant's 'sexual advances,' but also his 'requests for sexual favors, or other verbal or physical conduct of a sexual nature,' must be 'unwelcome' in order to support a guilty verdict. Moreover, nowhere does the abstract portion of the jury charge inform the jury that it must find that the appellant was aware that any of his sexual conduct was unwelcome. These are elemental facts. The application paragraph of the jury charge does nothing to ameliorate these deficiencies.").

[7] 530 U.S. 466, 491-92 (2000) (New Jersey law prescribed that a hate-crime enhancement that raised the punishment range for the offense be decided by a trial judge at the punishment stage instead of by a jury at the guilt stage.).

[8] 527 U.S. 1, 6 (1999) ("Materiality" element of the offense was not submitted to the jury; in fact, jury was instructed that it "is not a question for the jury to decide.").

[9] The cases also differ from the present case in other significant ways. In *Ruiz*, the Court did find egregious harm, but it did so by also finding the evidence of sudden passion to be "substantial," pointing to an initial jury verdict on voluntary manslaughter (that did not hold up to jury polling), and pointing to a jury note specifically about the interaction between murder and voluntary manslaughter.

[10] 702 S.W.2d 650, 651-52 (Tex. Crim. App. 1986) (op. on Appellant's mot. for reh'g) (definition of "deception" omitted entirely from the jury charge).

"egregious harm" standard for unpreserved error.[11]  In the present case, error was *not preserved*, so even if the facts in *MacDougall* were on all fours with the facts of the present case (which they are not), the difference in the harm standards could very well dictate a different result.

**B. Reason 1: Given the jury charge, the State's comments, and what people know about murder in general, the jury must have understood that the State had to prove causation.**

This Court has previously made the general statement that the application paragraph is the "heart and soul" of the jury charge.[12]  But that general statement of law should not blind us to the realities of a particular jury charge.  Sometimes, an error in an application paragraph is not significant, when one looks at the jury charge as a whole.[13]  A review of the entire guilt-stage jury charge and other factors shows that the jury would necessarily have focused on and given effect to the abstract murder paragraph, with its requirement that causation be proven for both theories of murder.

**1.** ***The abstract murder paragraph was prominent and easy to read, and it clearly required proof of causation.***

In the second paragraph of the jury charge, the trial court instructed that it would give some

---

[11]  *See id.* (The defendant complained that the trial court erred "in refusing his request to define the term 'deception,'" and this Court concluded that the defendant "has shown some harm.").

[12]  *See Vasquez v. State*, 389 S.W.3d 361, 366-67 (Tex. Crim. App. 2012).

[13]  *See Gelinas v. State*, 398 S.W.3d 703, 707 (Tex. Crim. App. 2013) (plurality op.) ("[W]e do not agree with the great weight the *Hutch* plurality placed on this factor, weighing in favor of finding egregious harm, simply because of the error's location in the application paragraph.  Just as Presiding Judge Onion stated in his concurring and dissenting opinion in *Almanza*, we, too, question the wisdom of reversing upon 'finding a single defect in the exalted "application paragraph" . . . without consideration of the charge as a whole, or considering whether the jury was in any way misled.'") (quoting from *Almanza*, 686 S.W.2d at 177 (Onion, P.J., concurring and dissenting)) (ellipsis in *Gelinas*); *id.* at 711 (Cochran, J., concurring) (concluding that erroneous application paragraph instructions were "100% legalese" and made "no sense.").

"general instructions" that would be followed by "some specific rules of law about this particular case."[14]  After three pages of general instructions, the jury charge then turned to Appellant's case. Starting on page four, the very first two paragraphs of the specific instructions told the jury that Appellant was charged with "murder" and what "murder" means:

> Now, bearing in mind these instructions, the Defendant, Tareq Alkayyali, stands charged by indictment with the offense of murder, alleged to have been committed on or about the 28th day of May, 2019, in Tarrant County, Texas.  To this charge, the Defendant has pleaded not guilty.
> A person commits the offense of murder if he intentionally or knowingly causes the death of an individual; or if he intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual.

These two paragraphs were clear and concise.  The first told the jury that Appellant was charged with murder, and the second set out two theories of murder, both of which explicitly said that a murder occurs only if the defendant "causes the death of an individual."  By immediately explaining what murder means after saying that Appellant was charged with it, the second paragraph conveyed to the jury that it was setting out the elements of murder, causation being one of them. And because the second paragraph with the abstract definition of murder followed on the heels of the first paragraph highlighting that the defendant was charged with murder, the abstract murder definition was prominent.

### 2. *The application murder paragraph was difficult to read, so jurors had a strong incentive to focus on and defer to the abstract murder paragraph.*

After setting out abstract instructions relating to murder, the jury charge set out the

---

[14]  The paragraph said: "First, I will give you some general instructions which apply in every case.  Then I will give you some specific rules of law about this particular case, and finally I will explain to you the procedures you should follow in your deliberations."  The third category—procedures—involved  instructions on matters not at issue here, which included consulting with other jurors, selecting a presiding juror, not communicating with other people outside the jury room about the case, and delivering a unanimous verdict.

application paragraph, as follows:

> Now, if you find from the evidence beyond a reasonable doubt that the Defendant, Tareq Alkayyali, on or about the 28th day of May, 2019, in the County of Tarrant, State of Texas, did then and there intentionally or knowingly cause the death of an individual, Wasam Moussa, by impeding the normal breathing or circulation of the blood of Wasam Moussa by applying pressure to her throat or neck with his hand or arm or by blocking her nose or mouth with his hand or hands; or if you find from the evidence beyond a reasonable doubt that the Defendant, Tareq Alkayyali, on or about the 28th day of May, 2019, in the County of Tarrant, State of Texas, did then and there intentionally, with the intent to cause serious bodily injury to Wasam Moussa, commit an act clearly dangerous to human life, namely, by impeding the normal breathing or circulation of the blood of Wasam Moussa by applying pressure to her throat or neck with his hand or arm or by blocking her nose or mouth with his hand or hands, then you will find the Defendant guilty of the offense of murder.

To put it mildly, this application paragraph is difficult to read. The paragraph is actually a single sentence, and that sentence is long and unwieldy. The two theories of murder are separated by a mere semicolon. Other than the semicolon and the use of parallel, repetitive language, no organizational methods, such as spacing or numbering, are used to separate the two theories of murder liability. This is the kind of paragraph that makes one's eyes glaze over. It is the kind of paragraph that writing experts warn against drafting.

Objective metrics back up this conclusion. The version of Microsoft Word currently used by the Court incorporates an ability to analyze the Flesch-Kincade Grade Level and the Flesch Reading Ease Score of a particular passage. A passage is more readable if the Flesch-Kincade Grade Level is lower and the Flesch Reading Ease Score is higher. For example, the sentence, "The dog jumped over the moon," has a Flesch-Kincade Grade Level of 0.5 and a Flesch Reading Ease Score of 100. It is a very easy sentence to read. Analyzing the *abstract* murder paragraph in Appellant's jury charge yields a Flesch Kincade Grade Level of 12.8 and a Flesch Reading Ease Score of 41.3. Those scores signify a substantially more challenging passage. But the results for the *application*

murder paragraph are much worse: a Flesch Kincade Grade Level of 41.0 and a Flesch Reading Ease Score of 0.0.

Despite the difficulty of the reading level, it would be obvious to anyone that the application murder paragraph was intended to be an application of the principles in the abstract murder paragraph. That is, the two paragraphs were obviously intended to be abstract and application counterparts. Common sense suggests that, when faced with an easy-to-read passage and a difficult-to-read counterpart, a jury will gravitate to the easy-to-read passage. Even if the jury resolved itself to treat the passages equally, it would be a natural conclusion for such a jury to assume that an element that clearly appears in the easy-to-read passage must be somewhere in the more difficult-to-read counterpart passage.[15]

And while the semicolon in the application paragraph/sentence technically separates two wholly independent "if" clauses—only one of which includes the causation element—a semicolon denotes less separation than a period, and the semicolon here is used in an unusual way in an especially complex sentence. This challenging grammatical structure might contribute to a conclusion that the causation element appearing in the first "if" clause applies to the entire sentence.

---

[15] *See Gelinas*, 398 S.W.3d at 711 (Cochran, J., concurring) ("Let's face it. This jury (1) did not read the Article 38.23 jury instructions; (2) did read the instructions, but did not understand what they really said, and therefore ignored them; or (3) did read the instructions, knew that they were wrong, and therefore ignored them. The third option is the least likely; after all, neither the parties nor the trial judge knew that the instructions were wrong at the time that they were written or read. The most likely option is the first, which simply proves the old adage of 'garbage in, garbage out.' These instructions are 100% legalese. They make no sense. Trial judges should not be giving instructions like this. This is not a case in which the reviewing court should apply the usual presumption that the jury understood and applied the court's charge in the way it was written. Here, we know that the jury, composed of normal people, was unlikely to have understood the jury charge as it was written because not even the lawyers and trial judge, attuned though they may be to legalese, understood what the instructions said.").

**3. *Various parts of the jury charge required the jury to give effect to the abstract murder instruction, encouraging the jury to harmonize the instructions to require causation.***

As I have previously explained, the abstract murder paragraph conveyed to the jury that it was describing the elements of the charged offense of murder. Before that paragraph, two instructions in the jury charge made it clear that the jury could not find the defendant guilty unless it found all elements of the offense beyond a reasonable doubt:

> All persons are presumed to be innocent and no person may be convicted of an offense unless each element of the offense is proved beyond a reasonable doubt.

> * * *

> The prosecution has the burden of proving the Defendant guilty and it must do so by proving each and every element of the offense charged beyond a reasonable doubt and if it falls to do so, you must acquit the Defendant.

So, if the jury found that the abstract paragraph's causation element for the second murder theory was not proven, these element-of-the-offense instructions required the jury to acquit the defendant.

This Court has said that the application paragraph is what, "as a practical matter," authorizes a conviction in the jury charge.[16] But this Court has also recognized that the wording of an abstract instruction can cause it to "function[] as a kind of application paragraph."[17] "While it will usually follow that authorization for conviction appears in the application paragraph of a typical instruction, wording of the other abstract portion of the charge may also authorize the trier of fact to reach *or not reach* the ultimate issue in a case."[18] Here, the two elements-of-the-offense instructions say that a

---

[16] *Yzaguirre v. State*, 394 S.W.3d 526, 530 (Tex. Crim. App. 2013).

[17] *Malik v. State*, 953 S.W.2d 234, 235 (Tex. Crim. App. 1997).

[18] *Arceneaux v. State*, 803 S.W.2d 267, 271 (Tex. Crim. App. 1990), *overruled on other grounds by Malik*, *supra* (emphasis added).

person cannot be convicted if all the elements of the offense are not proven, and the second of these instructions explicitly requires the jury to acquit (i.e. to *refrain* from finding guilt) if an element is not proven. This second instruction, at least, is authorizational in nature and is readily susceptible to being read in conjunction with the abstract murder paragraph.

So, even if the jury were diligent enough to finely parse Appellant's application murder paragraph and determine that it did not contain the element of causation on the second murder theory, it would nevertheless have the abstract murder paragraph, which makes causation an element, and the instructions requiring an acquittal if an element is not proven. And such a diligent jury would not overlook the abstract murder paragraph. The abstract murder paragraph is simply too prominent and too clear to be overlooked by any jury, especially in light of what people generally know about murder, which I will discuss in a later section.

And if the jury realized that the abstract and application paragraphs for murder did not line up, then it would have had to consciously disregard the abstract paragraph to be misled by the absence of causation in the application paragraph. For a jury to consciously disregard the abstract paragraph in favor of a focus on the application paragraph, it would, at a minimum, have to believe that the application paragraph is more important than the abstract paragraph. But nothing in the jury charge flags the application murder paragraph as special. There are no headings in the jury charge. The application paragraph is not labeled as such. No language in the application paragraph says that it is more important than other portions of the charge.

In fact, the first page of the jury charge contains an instruction to the contrary:

You have no right to disregard or give special attention to any one instruction, or to question the wisdom or correctness of any rule I may state to you.

The jury would be disobeying this instruction if it disregarded the abstract paragraph or gave special attention to the application paragraph. If the jury did see a variance between the abstract and application paragraphs on the issue of causation, the obvious way to comply with the trial court's consider-the-entire-charge-equally instruction would have been to harmonize the instructions by giving effect to both paragraphs, requiring the State to carry its burden of proof under both of them to obtain a conviction.

### 4. *The submitted lesser-included offenses both required causation.*

Causing death was an element of the lesser-included offenses. The abstract and application paragraphs for those offenses correctly instructed the jury on that element:

> A person commits the offense of manslaughter if the person recklessly *causes the death of an individual*.
>
> * * *
>
> Now, if you find from the evidence beyond a reasonable doubt that the Defendant, Tareq Alkayyali, on or about the 28th day of May, 2019, in the County of Tarrant, State of Texas, did then and there recklessly *cause the death of an individual*, Wasam Moussa, by impeding the normal breathing or circulation of the blood of Wasam Moussa by applying pressure to her throat or neck with his hand or arm or by blocking her nose or mouth with his hand or hands, then you will find the Defendant guilty of the offense of manslaughter.
>
> * * *
>
> A person commits the offense of criminally negligent homicide if the person *causes the death of an individual* by criminal negligence.
>
> * * *
>
> Now, if you find from the evidence beyond a reasonable doubt that the Defendant, Tareq Alkayyali, on or about the 28th day of May, 2019, in the County of Tarrant, State of Texas, did then and there with criminal negligence *cause the death of an individual*, Wasam Moussa, by impeding the normal breathing or circulation of the blood of Wasam Moussa by applying pressure to her throat or neck with his hand or arm or by blocking her nose or mouth with his hand or hands, then you will find the

Defendant guilty of the offense of criminally negligent homicide.[19]

The jury might not have even reached the lesser-included offenses during deliberations, but it would have heard the trial judge read the entire jury charge before the parties' closing arguments. The reading of the lesser-included-offense instructions would have reinforced the notion that causing death was an element of every offense at issue in the case. Any juror recalling the lesser–included offense instructions would find it very odd for the second murder theory to be the only offense in the entire jury charge that did not require a showing that Appellant caused the victim's death.

**5. *The State told the jury that the State had to prove causation.***

During voir dire, the prosecutor said that both theories of murder required causation:

> [A]nd then we have *two ways that you can cause the death*. Right? Caused the death of Wasam Moussa by impeding the normal breathing or circulation of the blood of Wasam Moussa by applying pressure to her throat or neck with his hand or arm, or by blocking her nose or mouth with his hand or hands, *or* with the intent to cause serious bodily injury to Wasam Moussa commits an act clearly dangerous to human life by applying pressure to her throat or neck with his hand or arm, or by blocking her nose or mouth with his hand or hands.

> \* \* \*

> The reason why the law has it written the second way is because sometimes people say, oh, yeah, I shot you, but I shot you in the foot, I didn't mean for you to die. Right? *But if you shoot at somebody and you hit them in the leg, you happen to hit an artery or something like that,* do we get to step back and say, well, that wasn't my intent? No. Right? You did something that was an act clearly dangerous to human life. You were going to do something that was going to cause serious bodily injury, and so it doesn't matter that that was your intent just to hurt somebody *if, in fact, they died*.[20]

So it was not a surprise to the jury for the abstract murder paragraph to say that both theories of

---

[19] Emphasis added. *See* TEX. PENAL CODE §§ 19.04(a), 19.05(a).

[20] Emphasis added.

murder required causation.  And any juror looking at the application murder paragraph would likely say causation must be there because the prosecutor said it was.  Even if a juror realized the causation element was missing from the application paragraph, the prosecutor's comments would reinforce the notion of using the abstract murder paragraph as a guide to determining the elements of the offense the State must prove.

**6. *Causation is a widely understood element of murder.***

Murder is one offense of which the American public has a high degree of awareness.  The "murder mystery" is a well-recognized sub-genre of the mystery genre in various avenues of entertainment.  Numerous novels have been written in the sub-genre, such as the classic *Murder on the Orient Express* by Agatha Christie.  Television series abound, with classic examples being various iterations of the game show "Whodunnit"[21] and the mystery series "Murder She Wrote."  The murder mystery can be found in movies, with a classic example being the 1976 film *Murder by Death*.  The murder mystery has also been popularized in games such as the board game *Clue* and the dinner-party game *How to Host a Murder*.  The word "whodunit" has made its way into the English lexicon, with Merriam-Webster's website defining the word as "a detective story or mystery story."[22]

This significant exposure to the murder-mystery sub-genre has caused the American public in general to be informed of certain basic concepts relating to murder, including causation.  It is widely known that a murder involves one person causing the death of someone else.  For instance,

---

[21]  A British show of that name ran in 1974, and an American version ran in 2013.

[22]  *Whodunit*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/whodunit (last visited February 26, 2025).

on the solution page for one of the characters in the *Roman Ruins* version of *How to Host a Murder*, the first sentence reads:

> Everyone had a motive, everyone had access and indeed, a number of Flabbius' guests did make attempts on his life. The question is, whose attempt was successful?[23]

Because a jury would naturally expect causation to be an element of murder, it would naturally focus on the abstract paragraph that clearly made it such.

### 7. *If this jury had thought the murder application paragraph did not require causation, it would have seen a problem and reached out to the trial court.*

As I explained earlier, the abstract murder paragraph is simply too prominent and too clear, and the causation element too consistent with what people generally know about murder, for any jury to misunderstand or overlook it. If the jury thought the application murder paragraph was inconsistent with its abstract counterpart, it could have sought guidance from the trial court. And this particular jury showed that it was not shy about seeking guidance when it sent two guidance-seeking notes to the trial court at the punishment stage of trial.[24] Consequently, we have every reason to think that the jury here would not have hesitated to query the trial court if it thought the abstract and application paragraphs were insolubly inconsistent. Either the jury was confident that

---

[23] Gail M. Peck, Doug Peterson, and Neil Shusterman, *Roman Ruins* (episode 11), HOW TO HOST A MURDER (1996).

[24] The jury sent three notes. The first asked for certain exhibits. In the second note, the jury asked, "May we have a clarification of what to do if we do not all agree it was sudden passion." The trial court responded, "In response to your note, please continue to deliberate." In its third note, the jury asked, "For the fine, does this go to the family, is it donated or does it go elsewhere? If it is donated, may we choose the organization it is donated to? (if we choose a fine amount)." The trial court responded, "In response to your note, if a fine is assessed, it is ordered paid to the State of Texas. Please continue your deliberations."). The jury answered "no" to a special issue on "sudden passion," sentenced Appellant to 23 years in prison, and assessed no fine.

the jury charge required causation under both murder theories or it decided that any variance on the issue of causation did not matter because causation was a given. Either way, the jury necessarily found that Appellant caused the victim's death.

    **8. *Response to the concurring opinion (and to a degree, the other dissent).***

    I appreciate the serious efforts spent by Judge Yeary and Judge Finley in addressing my first reason for finding the error harmless. Ultimately, though, I think their critiques fall short. In part, that is because the various parts of my dissent reinforce each other into a coherent whole that shows that the jury had to have understood that causation was an element, or else had to decide it did not matter because causation was proven in any event. The lynchpin of the argument is the clear, concise, and accurate abstract murder paragraph. Without it, I would be relying solely on my second reason for finding the error harmless. But as I have explained earlier, numerous factors reinforce what the abstract paragraph clearly says. While the interlocking nature of the various parts of my argument answers much of the criticism against it, I turn to some of the specific critiques.

    In his concurrence, Judge Yeary suggests that the abstract murder paragraph lacked prominence because it appeared on a page with five other definitions. That reasoning assumes that the jurors' only exposure to the jury charge was reading it themselves. But, the jury charge was *read aloud* by the trial judge to the jury. In hearing it read aloud, the jurors would have naturally focused on the first reference to murder that they heard. And what the jurors heard first was a rather concise statement that Appellant was charged with murder, followed by a statement that he pled not guilty, further followed by the abstract paragraph defining the offense of murder. In fact, the judge had primed the jury to pay attention to these particular instructions by saying that he would first give some general instructions and then give instructions specific to the case. And when it came time to

transition to the case-specific instructions, the trial judge used language ("bearing in mind these instructions") to draw the jury's attention to this transition.[25]

The concurrence and Judge Finley's dissent express concerns about relying upon popular conceptions about an offense. One answer to this concern is that the causation element of murder is unique. It would be surprising to find anyone serving on a jury who did not already have a pre-existing understanding that a murder involves causing death. There is likely no other offense element that comes close to the ubiquitous understanding that American adults have about the causation element of murder. But I am not suggesting that this pre-existing understanding *alone* could render a jury-charge error harmless. My point is that this pre-existing understanding coincided with the causation element contained in the abstract murder instruction that the jurors heard. I am not disputing the concurrence's view that jurors do not necessarily expect their conceptions of an offense to gibe with the law. But here, this abnormally ubiquitous conception *does* gibe with the law, as given in the abstract paragraph, giving it much more potency than one would normally expect of an abstract paragraph. And that potency was further enhanced by the State explicitly telling the jurors, in line with what they already understood, that causation was indeed an element of both theories of murder.

The concurrence says that the application paragraph was at least as, or more, prominent because it had a page to itself. Obviously, the jury would have seen the application paragraph as such—one that applied the law to the specific indictment facts. But that does not change the fact that

---

[25] Even looking at the written page, the abstract murder definition has prominence because it is basically at the top, preceded only by statements about being charged with murder and pleading not guilty. So the jury would not have had to wade through the other definitions to find it. And the fact that the page contained a bunch of useful definitions made it more likely that the jurors would consult it.

the application paragraph was difficult to read. The concurrence seems to disagree, concluding that the paragraph was "perfectly navigable." Yet, the trial judge, the prosecutor, and the defense attorney all failed to navigate it. This was not a case where the trial participants had differing views on what the law required. They all knew that the second murder theory required causation. Yet, they all missed the fact that the application paragraph's rendition of the second murder theory did not require it. If three educated lawyers could not navigate the application paragraph, why should we expect more from the jury?[26]

Criticizing my reliance on the fact that causation appears in every other abstract and application paragraph in the jury charge, the concurrence essentially says, "If all the application paragraphs but one has causation, the jury might think the one outlier was meant to be that way." That reasoning might make sense if we were comparing only *application* paragraphs. But *all* the *abstract* paragraphs required causation, including the one that corresponded to the outlier application paragraph, so the natural conclusion to draw was that causation was an element of every offense in the jury charge.

The concurrence and the other dissent rely heavily on the application paragraph authorizing the conviction, but as I explained earlier, that is not the full story. An abstract paragraph can be "authorizational" if it tells the jury to do something if certain conditions are met or not met.[27] Most jury charges do not contain abstract paragraphs that effectively convey authorizational instructions

---

[26] *See supra* at n.15.

[27] *See supra* at nn.17, 18.

not already conveyed by the application paragraph.[28] But Appellant's jury charge did: it told the jury that Appellant was charged with murder, then set out an abstract paragraph correctly defining that offense, and, elsewhere, told the jury that it must acquit if the State fails to prove all the elements of the offense. The concurrence criticizes this point, saying if it were reasonable to think that a jury could combine instructions in this way, creating an application paragraph of its own, there would be no need for an application paragraph. But my point is not that an application paragraph is unimportant, but that we need to look at the jury charge that was actually given, in light of the trial that actually occurred. Elsewhere, the concurrence refers to a "requirement" that the application paragraph at least refer back to the abstract paragraph, but the concurrence overstates the matter, since a set of abstract instructions *can* be authorizational, if the right conditions are present.

The concurrence suggests that the problem here is that the abstract and application paragraphs conflicted, so the jury had to disregard one to give effect to the other. If the jurors were able to do what the lawyers in this case were unable to do and successfully parsed the complex application paragraph, then they would have concluded that it conflicts with the abstract paragraph. That does not mean that the jurors were relegated to throwing up their hands and deciding to pick an instruction to ignore. The solution to a perceived conflict is to seek guidance from the trial court. As I explained earlier, *this jury* showed that it was not shy about doing that—it sought help in the punishment stage *twice*. It would have sought help at the guilt stage if it had seen a conflict in the

---

[28] *See, e.g.*, *Crenshaw v. State*, 378 S.W.3d 460, 463-64, 467 (Tex. Crim. App. 2012) (".08" definition of intoxication not set out in the information was contained in an abstract instruction but not in the application paragraph, so there was nothing requiring the jury to implement it to find the defendant guilty or not guilty).

instructions that mattered. It didn't.[29]

The concurrence suggests that perhaps the jurors did not see a problem because they viewed the allegations in the application paragraph as a form of "transferred causation." Apparently the concurrence is contending that the jurors might think that certain elements in the jury charge—proof of intent to cause serious bodily injury and proof of an act clearly dangerous to human life—could be seen as "standing in" for causation. Of course, nothing in the jury charge suggests this, and there is the problem that the application paragraph does not complete this supposed constructive-causation chain by saying that the victim died.[30] And a notion of transferred or constructive causation is a complex concept that would not come naturally to jurors. It is unlikely that a jury as proactive as this one was shown to be would quietly assume that some unarticulated, complex theory of transferred or constructive causation applied to a murder theory that appeared to be missing the causation element. If the proactive jurors in this case had thought that such a theory might apply, and thought that it mattered, they would have reached out to the trial court to be sure. They didn't.

Judge Finley's dissent suggests that the jury could have reasonably assumed that the abstract murder paragraph was wrong because the application paragraph and the indictment shared the same error. But if the jurors failed to navigate the application paragraph, any judgment by them that it was similar to the indictment would not matter. At least the indictment clearly divided the two theories, but it is almost certain that the jurors did not snap to the absence of a causation element when the

---

[29] To the extent the concurrence expresses concerns about jury unanimity, I also point out that one of the issues the jury sought guidance from the trial court on was a unanimity issue.

[30] *Cf.* TEX. PENAL CODE § 6.04(b)(2) ("A person is nevertheless criminally responsible for causing a result if the only difference between what actually occurred and what he desired, contemplated, or risked is that . . . (2) a different person or property was injured, harmed, or otherwise affected.") (transferred-intent statute).

indictment was read because (1) they had no time to think about the indictment language before hearing opening statements, (2) they had previously been told that causation applied, and (3) the causation-like element of "clearly dangerous to human life" was present. And at the end of trial, the application paragraph smashed the two murder theories together, making it exceedingly unlikely that the jury would recall the precise organization of the indictment when it was read. Notably, the jury charge did not contain the indictment allegations in an accusation section, as some jury charges do.[31] But, if the jurors noticed that the indictment and the application paragraph both lacked the causation element for the second murder theory, the presence of causation in the abstract instruction would still have been a red flag that would have prompted this proactive jury to reach out to the trial court.

Most likely the jurors did not notice that the application paragraph was missing an element.[32] If the jurors did notice, they likely thought it did not matter because, as Judge Finley's dissent elaborates, it was not seriously contested that Appellant had caused the victim's death. It is possible that the jurors saw what I see, as I argue *infra* in my second reason—that a finding of causation is inevitable if they believe all the elements contained in the second part of the application paragraph in light of the evidence in the case. Regardless, the whole of this record leads to an unmistakable conclusion: the jurors either believed causation was required and found it, or believed causation was likely required and did not bother the trial court because they were finding causation anyway.

**C. Reason 2: Given the statutory and non-statutory elements in the application murder paragraph and the evidence at trial, the jury must have found causation anyway.**

---

[31] *See Hernandez v. State*, 556 S.W.3d 308, 330 (Tex. Crim. App. 2018) (accusation section in the jury charge).

[32] *See supra* at n.15.

To set the stage for why the jury would have necessarily found causation on the basis of what was actually in the application murder paragraph, I detail just the portion of the paragraph relating to the second murder theory and emphasize some important parts:

> if you find from the evidence beyond a reasonable doubt that the Defendant, Tareq Alkayyall, on or about the 28th day of May, 2019, in the County of Tarrant, State of Texas, did then and there *intentionally, with the intent to cause serious bodily injury* to Wasam Moussa, *commit an act clearly dangerous to human life*, namely, *by impeding the normal breathing or circulation of the blood* of Wasam Moussa *by applying pressure to her throat or neck* with his hand or arm *or by blocking her nose or mouth* with his hand or hands, then you will find the Defendant guilty of the offense of murder.[33]

This portion of the application paragraph requires proof of four elements, two of which are statutory and two of which are non-statutory. The statutory elements are: (1) intent to cause serious bodily injury, and (2) committing an act clearly dangerous to human life.[34] The non-statutory elements are: (3) a culpable mental state of "intentionally" regarding the commission of the dangerous act, and (4) impeding breathing or circulation by either applying pressure to the throat or neck or by blocking the nose or mouth. As I will explain later, a finding on element (1) creates a substantial likelihood of the jury also finding causation, while a finding on elements (2) and (4), when combined with the evidence at trial, will *necessarily* entail the jury finding that Appellant caused the victim's death.

> **1. *A jury that finds "intent to cause serious bodily injury" under the jury charge and the evidence would necessarily find that Appellant intended the kind of injury that would create a substantial risk of death, and a finding of that latter intent would create a substantial likelihood of the jury also finding causation.***

In conformity with statute, the jury charge defined the culpable mental state of "intent" or intentionally" in the following way:

---

[33] Emphasis added.

[34] *See* TEX. PENAL CODE § 19.02(b)(2).

A person acts intentionally, or with intent, with respect to a result of his conduct when it is his conscious objective or desire to cause the result.[35]

So the jury charge required the jury to find that Appellant had the conscious objective or desire to cause an injury and it required that this desired injury would be classified as serious bodily injury.

Also, in conformity with statute, the jury charge defined "bodily injury" and "serious bodily injury." Bodily injury was defined as "physical pain, illness, or any impairment of physical condition."[36] The only part of this definition that fits "serious bodily injury" under the facts of this case is "any impairment of physical condition," so I will incorporate that part into the jury charge's definition of serious bodily injury:

bodily injury [impairment of a physical condition] that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ.[37]

The parts of the "serious bodily injury" definition that involve "serious permanent disfigurement" or "protracted loss or impairment of the function of any bodily member or organ" do not really apply here. Appellant was not charged with poking someone's eye or cutting off a finger. What he was charged with—impeding breathing or circulation—threatened perhaps four "organs": the brain, the lungs, the heart, and the entire circulatory system. Any "protracted impairment" of one of these "organs" is inherently tied to the risk of death. So the application paragraph effectively required the jury to find that Appellant had the conscious objective or desire to create an

---

[35] *See* TEX. PENAL CODE § 6.03(a).

[36] *See id.* § 1.07(a)(8).

[37] *See id.* § 1.07(a)(46). Bracketed material added based on jury charge's definition of "bodily injury."

"impairment of physical condition that creates a substantial risk of death."[38]

Finding this culpable mental state does not alone make a finding of causation inevitable, but it does make such a finding very likely. If a jury believes that a defendant intended to engage in conduct that creates a substantial risk of death, the jury is much more likely to also believe that the victim's death was in fact the result of that intended conduct.[39]

> **2. *A jury that finds that Appellant committed "an act clearly dangerous to human life" would necessarily find that he committed an act that created a substantial risk of death.***

I turn to the second statutory element contained in the application paragraph: that the defendant "commit[ted] an act clearly dangerous to human life."[40] The word "dangerous" is not statutorily defined, but it means "able or likely to cause harm or injury."[41] Thus, the word "dangerous" itself is suggestive of causation, and when used in conjunction with human life, indicates a risk of causing death. In addition, the word "clearly" modified "dangerous," so we are not talking about an insubstantial or remote risk. So, to find Appellant guilty under the application paragraph, the jurors had to believe, not only that Appellant intended to subject his wife to a physical condition that created a substantial risk of death, but that he also committed an act that created such a substantial risk of death.

---

[38] I will not address the language "or causes death" in the definition since it is alternative wording and involves proving more than "a substantial risk of death."

[39] As set out earlier, the jury charge varies from statute by placing the word "intentionally" before the phrases "intent to cause serious bodily injury" and "clearly dangerous" act. I need not address whether "intentionally" here adds meaning not otherwise conferred by the culpable mental state of "intent to cause serious bodily injury."

[40] *See supra* at nn.33, 34, and accompanying text.

[41] *Dangerous*, COREL WORDPERFECT 2021 DICTIONARY.

**3.** ***A jury that finds that Appellant created a substantial risk of death by "impeding the normal breathing or circulation of the blood," as required by the application paragraph, would necessarily find that Appellant caused death under the evidence in this case.***

An abstract instruction in the jury charge set out the statutory standard of causation:

A person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor was clearly insufficient to produce the result.[42]

This standard requires that the defendant's conduct be a "but for" cause if the defendant's conduct operates alone. If another cause is present, and the two together operate as a "but for" cause of the result, then the defendant's conduct counts as a "cause" *unless* the defendant's conduct is "*clearly* insufficient" to produce the result *and* the other concurrent cause is "*clearly* sufficient" to produce the result.

The word "clearly" appears both in the statutory standard for causation and in the "act clearly dangerous to human life" element of the second murder theory. The appearance of the word in both contexts suggests the following question: When can an act that is clearly dangerous to human life be clearly insufficient to cause death? There are only a few possible answers to that question, and it will become clear in my discussion that none are implicated in this case. As we shall see, a jury's finding of guilt under the wording of the second part of the application paragraph, by itself, almost guarantees a finding of causation under the statutory definition. When the evidence at trial is factored in, the application-paragraph wording finishes the job. In a nutshell, the application-paragraph allegation of "impeding the normal breathing or circulation of the blood," when combined with the "clearly dangerous act" allegation and undisputed evidence, establishes causation unless

_____

[42] *See* TEX. PENAL CODE § 6.04(a).

something breaks causation as a concurrent cause. And the only way a concurrent cause could break causation under these allegations would be if it were *clear* that the dangerous effects of the "impeding" conduct were undone *and* that some other cause was clearly sufficient to explain the victim's death. Neither of those causation-breaking blocks is supported by the evidence at trial.

No one disputes that the victim died. Nor does anyone dispute that, whatever conduct it was that Appellant engaged in, the victim collapsed into unconsciousness during the conduct and died from that collapse. Nor is it disputed that the victim's death happened because she stopped breathing or her blood stopped circulating. At most, the dispute centers around what created that condition—the defendant's conduct, the victim's health problems, or a combination of both.

To find Appellant guilty under the language of the second part of the application paragraph, the jury had to believe that Appellant engaged in either strangulation—impeding the normal breathing or circulation of the blood by applying pressure to the victim's throat or neck—or suffocation—impeding the normal breathing or circulation of the blood by blocking the victim's nose or mouth. The "impeding" part of strangulation or suffocation is a "bodily injury" because it is an "impairment of physical condition."[43] And because "impeding" is part of the conduct alleged, it is part of the *act*, but it is also the *injury* at issue in this case.

As I explained earlier, an "act clearly dangerous to human life" is one that creates a substantial risk of death. So, under Appellant's jury charge, the question boils down to whether Appellant created an "impeding" severe enough to create a substantial risk of death. "Creating a

---

[43] *See also Ortiz v. State*, 623 S.W.3d 804, 807 (Tex. Crim. App. 2021) ("Impeding normal breathing or blood circulation describes occlusion assault's required injury."). For the remainder of this opinion, I use "impeding" as shorthand for "impeding the normal breathing or circulation of the blood."

risk" is causation-type language. Something creates a "risk" of death because it has some tendency to cause death. And something creates a substantial risk of death if it has a substantial tendency to cause death. And because "impeding" is an *injury* and not just part of an *act*, an "impeding" that creates a substantial risk of death also constitutes an injury that has a substantial tendency to cause death.

When the conduct that creates a substantial risk of death is not itself an injury, the causal tendency that the risk involves might not be realized. For example, if a defendant shoots at someone, the very act of shooting creates a substantial risk of death. Just shooting at someone has a tendency to make that person's death happen. If the bullet misses, then that risk, that causal tendency, is not realized. If a hypothetical defendant shoots at a victim and misses, and a car swerves onto the sidewalk for a completely unrelated reason and kills the victim, one could say that the defendant did not in fact cause the victim's death, despite creating a substantial risk of death and despite the fact that the victim died. The gunshot would not be a "but for" cause of death in that situation.

But the risk of death from "impeding" flows from the defendant's hands-on impairment of the victim's physical condition (the impeding "injury"). It is the severity of the impairment or injury (e.g., how severe breathing is being restricted), not the risk of impairment or injury (e.g., whether a gunshot will hit), that poses the risk of death under the application paragraph's instructions. So it becomes more difficult to see how an *injury* that creates a substantial risk of death would be causally unrelated to a death that shortly follows the injury and is consistent with the injury. If there are no concurrent causes, then a rational jury would have to find in that situation that the injury was a "but for" cause of the death that it had created the substantial risk of causing.

On the other hand, if there were *two* life-threatening injuries, and these two injuries were threatening in *different ways*, one might be found to be a "but for" cause of death while the other is not. If shooting a victim in the arm creates a substantial risk of death if the victim bleeds out, but a large boulder independently falls on and crushes the victim before any bleeding out occurs, then we could say that the gunshot injury to the arm did not in fact cause death. In the bleeding-arm scenario, the gunshot was not a "but for" cause of death because death was caused instead by the boulder.

But what if the two life-threatening injuries were threatening in basically the same way? Suppose the victim were shot (by two different people) in two different places—e.g., an arm and a leg—and each injury created a substantial risk of death from bleeding out? If neither wound is bandaged and the victim dies from bleeding out, both wounds would be concurrent causes—concurrently acting as a "but for" cause—and neither would be clearly insufficient to cause death. In that situation, both shooters would be said to have caused the victim's death under Texas law. If the leg was bandaged, so that the risk of bleeding out was stopped, it might be possible to say that the leg wound was clearly insufficient to cause death due to ameliorative action. Of course, if the bleeding leg healed quickly on its own, despite the substantial risk of death it posed, then it might also be said that the bleeding leg was clearly insufficient to cause death.

But in Appellant's case, even if the evidence showed two life-threatening injuries that could explain why the victim stopped breathing or her blood stopped circulating—Appellant's "impeding" conduct and the victim's pre-existing medical condition—that would not make Appellant's "impeding" conduct "clearly insufficient" to cause the result. After all, the jury would have found that the "impeding" injury that Appellant inflicted created a substantial risk of death. How can an

injury be "clearly insufficient" to cause death while also creating a substantial risk of death? As explained above, the only way a substantial risk of death from an injury could become clearly insufficient would be if that substantial risk of death were clearly ended somehow. No such evidence exists in the record. Although the victim received CPR, no evidence suggests that such activity clearly eliminated the substantial risk of death Appellant's "impeding" injury created. And the victim never recovered after collapsing.

Moreover, the record does not show that the victim's medical condition was a life-threatening injury. The expert testimony was that the victim's heart repair was "intact." The testimony from Appellant suggests that the victim was suffering from fainting and other symptoms that might have been a sign of a health problem, but none of that *clearly* showed a health problem that was "sufficient" by itself to cause death, and certainly not on the day of the incident. In fact, the victim had lived for 18 years before even having a heart repair. And to the extent the victim's medical condition made her vulnerable to *stress*, clearly-dangerous-to-human-life "impeding" conduct against her would be extremely *stressful*.

The plurality opinion points to evidence that it thinks casts doubt on whether Appellant's "impeding" conduct caused death. I do not agree that the evidence the plurality points to has the persuasive value the plurality thinks it does. The petechiae under the scalp strongly supports a finding of strangling or suffocation, and the absence of petechiae in the eyes or elsewhere does not undermine such a finding. But even if it did, and even if the other questions the plurality raises about the medical evidence and the victim's health were valid, none of it would matter. Once the jury concludes, in accordance with the application paragraph, that Appellant inflicted an injury that created a substantial risk of death, all of this other evidence just muddies the concurrent-causation

waters. None of it shows that the defendant's conduct was clearly insufficient to cause the victim's death or that the victim's health condition was clearly sufficient to do so.

Appellant introduced his own testimony that his conduct was not that bad and that he could not have foreseen what would happen to his wife. That testimony, if believed, would negate the culpable mental state and the "clearly dangerous act" elements in the application paragraph. And all of Appellant's testimony about the victim's health problems could be used to feed those defensive positions—to explain why the victim died when the defendant's conduct was not clearly dangerous or was not intended to be serious enough to create a substantial risk of death. And if the plurality is right about the medical evidence, the lack of certainty in that evidence could also be used to suggest to the jury that the State had not proven that Appellant engaged in clearly dangerous conduct. But once the jury in this case took the step of finding that Appellant committed an act clearly dangerous to human life, a finding of causation became inevitable.

And it should be emphasized that the legislature put its thumb on the scale when it used the word "clearly" twice in the concurrent causation statute—biasing the inquiry into concurrent causation in favor of finding causation. Muddying the waters on the sufficiency or insufficiency of a concurrent cause is not enough to negate that bias in favor of causation. And here, we are not reviewing from scratch what a jury might think about causation. The issue being analyzed here is what the jury would have thought about an omitted element if it found the elements that were *present* in the application paragraph. So it must be assumed that the jury found the elements that were present, and under that assumption, the jury necessarily would have found the absent element of causation.

4. *Response to concurring opinion.*

The concurrence first contends, albeit in a footnote, that "impeding" breath or blood circulation is not necessarily an "injury." The concurrence bases this contention on his own dissenting opinions disagreeing with the majority of the Court.[44] Those dissents are contrary to the law. Even if credence were given to this contrarian view, at least one of those dissents has acknowledged that an "impeding" could be "protracted or forceful enough" to cause an injury.[45] Certainly, an "impeding" via suffocation or strangulation that was *clearly dangerous to human life* would necessarily be of such severity. In any event, by requiring a clearly-dangerous-to-human-life "impeding," the jury charge necessarily required the jury to find that Appellant put the victim's life in significant danger through direct physical action that would impede her breathing or circulation. Such physical action necessarily had a strong tendency to cause death.

The concurrence also contends that, even if the victim's death was not disputed, the application paragraph did not require the jury to pass on it. That does not matter. The victim's death was the backdrop of the State's case. There was expert testimony about her autopsy. The jury necessarily believed she died. And that belief forges the link in the chain between the application-paragraph allegations and causation.

The concurrence asserts that, without an explicit instruction that the jury must find that

---

[44] *See Marshall*, 479 S.W.3d at 846 (Yeary, J., concurring and dissenting, but dissenting on the issue in question) ("The Court concludes that a finding that Appellant impeded Shawne's breathing amounts to a finding of 'bodily injury per se[,]' and on that basis it holds that Appellant suffered no egregious harm by the jury charge error for *Almanza* purposes. I agree only that the application paragraph was erroneous. I cannot accept the Court's conclusion that 'impeding normal breathing . . . by blocking the . . . nose or mouth' constitutes 'bodily injury' per se.") (citations omitted, ellipses in Judge Yeary's op.); *Ortiz v. State*, 623 S.W.3d 804, 813 n.2 (Tex. Crim. App. 2021) (Yeary, J., dissenting) (adhering to his view in *Marshall*).

[45] *Marshall*, *supra* at 848 (Yeary, J., concurring and dissenting).

Appellant "caused the death," we cannot infer that the jury passed on whether Appellant caused the victim's death. But of course we can. Let's start with the following logic that would apply to a scenario lacking a concurrent cause:

> 1. The defendant exerted force against the victim in a close physical contact situation ("impeding" language in the application paragraph).
>
> 2. The force exerted in premise 1 had a high probability of causing the victim's death ("act clearly dangerous to human life" language in the application paragraph).
>
> 3. The victim died (incontrovertible fact shown by the evidence).
>
> 4. The collapse that led to the victim's death occurred during the exertion of force in premise 1 (undisputed fact shown by the evidence).
>
> 5. No fact independent of the defendant's conduct explains, or contributes to explaining, the victim's death (true if no concurrent cause is shown—assumed for purposes of further analysis).
>
> Conclusion: The defendant caused the victim's death.

No rational juror would deny the conclusion after accepting premises 1 through 5.

> But, the plurality essentially says, there was a concurrent cause: the victim's health problems.

To account for concurrent causation, we can modify premise 5 to say:

> 5. No fact independent of the defendant's conduct adequately explains, under the law of concurrent causation, the victim's death.

Even with premise 5 so modified, the conclusion still follows. The question is whether a rational juror could deny premise 5 under the evidence if he accepts premises 1 through 4, and the answer is "no." As I have explained earlier, for independent conduct to "adequately" explain the victim's death under the law of concurrent causation (so as to relieve the defendant of liability), the evidence must show that the defendant's conduct was "clearly insufficient" to cause death *and* that the independent conduct was "clearly sufficient" to cause death. If the jury finds the facts required by

the second murder theory's application instructions, neither of these is shown. The victim's death occurred because she stopped breathing or her blood stopped circulating. The medical evidence does not even come close to ruling out Appellant's "impeding" conduct as a cause of that. No rational jury who believes that Appellant's "impeding" conduct was *clearly dangerous to human life* would believe that the "impeding" was "clearly insufficient" to cause such a death. It is also true that there is no evidence that any health problem the victim had was clearly sufficient to cause death. So, a rational juror who believes the second murder theory's application instructions would necessarily believe that causation was shown.

The concurrence may be saying that, even if the jury must have found causation, we cannot be sure that the jury was *aware* it found causation, and that such lack of awareness violates due process. Given the fact that the jury charge is littered with references to causation, including the first murder theory, it is overwhelmingly likely that the jury was in fact aware it was finding causation (and there are the arguments I made under my first reason). But if by some chance the jury was not so aware, it found causation nevertheless. Especially absent an objection, I see no due process problem with the jury's lack of awareness that it was formally finding causation, so long as we can conclude, as I have, that the jury necessarily believed that Appellant caused the death.

Finally, the concurrence relies upon a dissent by Judge Clinton.[46] But it is not the law; it is a dissent.[47] And in fact, the concurrence cites this dissent for *why* it is a dissent, which means the

---

[46] *See Lawrence v. State*, 700 S.W.2d 208, 218 (Tex. Crim. App. 1985) (Clinton, J., concurring).

[47] *See Masterson v. State*, 155 S.W.3d 167, 175 (Tex. Crim. App. 2005) ("[B]ut the dissent is just that - a dissent.").

pronouncement being cited is contrary to established law.[48] And in any event, *Lawrence* appears to be distinguishable on both my harm-analysis reasons. Nothing in the application paragraph in *Lawrence* led, by any chain of reasoning, to a conclusion that the jury must have found the omitted element of the absence of sudden passion.[49] And I haven't been able to locate an abstract paragraph in any of the *Lawrence* opinions, but given the nature of the absence of sudden passion as an *implied* statutory element, the element was likely also absent from the abstract murder instructions.[50]

### D. Additional consideration: The jury's reaction to the sudden passion issue at the punishment stage.

The punishment stage cannot influence the guilt stage, but a jury's conduct during the punishment stage can sometimes give a court a window into what the jury was thinking at the guilt stage. As can be seen from the punishment-charge instructions, the "sudden passion" issue presupposed that the jury had found that Appellant had caused the victim's death:

> Now, having found the defendant guilty of the offense of murder, you must determine by a preponderance of the evidence whether or not the defendant *caused the death* under the immediate influence of sudden passion arising from an adequate cause.
>
> * * *
>
> Now, bearing in mind the foregoing instructions, if you unanimously believe the defendant proved by a preponderance of the evidence that the defendant, having committed the offense of murder, *caused the death* of Wasam Moussa, under the immediate influence of sudden passion arising from an adequate cause, you must make an affirmative finding as to the special issue, and the punishment you must

---

[48] *See Lawrence*, 700 S.W.2d at 218 (concluding that "voluntary manslaughter is an incidental theory of the defense," so "the subtle deletion of the State's burden of proof on the absence of sudden passion in the murder application paragraph cannot realistically be construed to inure to the defendant's egregious harm.").

[49] *See Lawrence v. State*, 699 S.W.2d 229, 229-30 (Tex. App.—Austin 1983), *rev'd,* 700 S.W.2d 208 (setting out application paragraph).

[50] *See supra* at n.5.

assess is by confinement in the Texas Department of Criminal Justice for any term of not more than twenty years or less than two years.

\* \* \*

But, if you do not unanimously believe the defendant proved by a preponderance of the evidence that the defendant, having committed the offense of murder, *caused the death* of Wasam Moussa, under the immediate influence of sudden passion arising from an adequate cause, you must make a negative finding as to the special issue, and the punishment you must assess is by confinement in the Texas Department of Criminal Justice for life or for any term of not more than ninety-nine years or less than five years.

\* \* \*

Do you the Jury find by a preponderance of the evidence that the defendant *caused the death* of Wasam Moussa, under the immediate influence of sudden passion arising from an adequate cause?[51]

As I alluded to earlier, the jurors sent a note to the trial court about the sudden-passion issue; they wanted to know what to do "if we do not all agree it was sudden passion."[52] The jurors said nothing about causation, despite the fact that the sudden-passion issue was littered with references to it. If the jurors had not in fact found causation at the guilt stage of trial, the natural reaction to the sudden-passion issue would have been to send a note along the lines of, "We didn't find that the defendant caused the victim's death. Were we supposed to? What do we do now?" Or at least, one would think the jurors would ask, "Do we need to find that the defendant caused the victim's death to answer the 'sudden passion' issue 'yes'?" But the jurors' only question about the sudden-passion issue was what to do if they could not resolve the issue unanimously.[53]

---

[51] Emphasis added.

[52] *See supra* at n.24.

[53] If the jurors had not yet looked at the verdict forms, they could legitimately have had a question about whether a *negative* answer to the sudden passion issue had to be unanimous, since

And while the sudden-passion issue presupposed a finding of causation, there is no reason to think that the jurors' rejection of the issue was based on a failure to find causation. From the verdict forms, the jurors knew that an affirmative finding to the sudden passion issue would place a 20-year ceiling on the punishment.[54] The jurors exceeded that ceiling, but not by a lot: they assessed a punishment of 23 years. If a failure to find causation was the only reason for a negative answer to the sudden-passion issue, the jurors could have assessed a sentence of 20 years or less in the blank for the verdict form that rejected a finding of sudden passion. They knew from that verdict form that a minimum sentence of 5 years was possible.[55] Assessing a sentence greater than 20 years merely on a technicality that makes the defendant even *less* culpable—that technically the sudden-passion issue requires a causation that the jurors didn't find—would be irrational, especially with the jurors already considering a 20-ish sentence. By assessing a sentence above 20 years, the jurors clearly signaled that they were finding the defendant to be *more* culpable than the sudden-passion issue described—though perhaps not by a lot.

Though a lot of other factors can figure into a relatively low sentence, such as the lack of a

---

instructions told the jurors to decide whether they "unanimously believe" the defendant proved sudden passion or "do not unanimously believe" the defendant proved it. But the verdict forms cleared that up. The first verdict form required, before filling in the blank for a sentence from 5 to 99 years or life, that the jurors had "unanimously made a negative finding" to the sudden passion special issue. Conversely, the second verdict form required, before filling in a blank for a sentence from 2 to 20 years, that the jurors had "unanimously made an affirmative finding" on that issue. When the trial judge told the jurors to "keep deliberating," any residual confusion would have been cleared up: the jurors would know that they had to be unanimous one way or the other. And if the jurors understood that already from the verdict forms, and were just wondering whether there was a third option if they did not agree, the trial court's answer conveyed that they were expected to come to an agreement.

[54] *See supra* at n.53.

[55] *See id.*

prior criminal history, the jurors' sentence of 23 years might suggest that they in fact relied upon the second murder theory at guilt—that they viewed Appellant as not being an intentional murderer and perhaps also accepted his statements of remorse. Nevertheless, the jurors' response to the sudden-passion issue in their note suggests that they were not at all surprised by the causation references, because they had in fact already found causation.

**E**. **Response to concurrence: We should not be quick to find structural error.**

**1.** *The Court should not use the Texas Constitution to start recognizing its own categories of "structural" error.*

The concurrence contends that this Court should recognize a category of "structural errors" under the Texas Constitution that are immune from a harm analysis. The concurrence further contends that a jury-charge error that entirely omits an element of the offense would be one such error.[56] I cannot agree with the concurrence's proposed change in our jurisprudence.

In *Cain v. State*, this Court purposefully set out a broad rule that *all* errors, except for those labeled as "structural" by the United States Supreme Court, would be subject to a harm analysis:

> Except for certain federal constitutional errors labeled by the United States Supreme Court as "structural," no error, whether it relates to jurisdiction, voluntariness of a plea, or any other mandatory requirement, is categorically immune to a harmless error analysis.
>
> * * *
>
> [A]ppellate courts should not automatically foreclose the application of the harmless error test to certain categories of error. Where an error is shown to be harmless, it is not a ground for reversal, regardless of the category or label attached to that particular error.[57]

---

[56] The concurrence acknowledges that this case does not involve such an error.

[57] 947 S.W.2d 262, 264 (Tex. Crim. App. 1997).

This Court expressly overruled every other case that conflicted with that pronouncement.[58]

In fact, later cases have recognized that "*Cain* issued a 'broad mandate' that brought the overwhelming majority of errors within the purview of a harm analysis."[59] *Cain* signaled that the era of widespread-automatic-reversible-error had ended.[60] This Court has reaffirmed *Cain*'s holding numerous times, including very recent cases.[61] Even our sister court, the Texas Supreme Court, has

---

[58] *Id.* ("To the extent that *Marin*, *Morales*, *Whitten*, and any other decision conflicts with the present opinion, they are overruled."). In another case, the concurrence has argued that we should not continue to adhere to *Cain* because, unlike the harm standard in place when *Cain* was decided, the current constitutional harm standard in our rules of appellate procedure allows for certain errors not to be subject to a harm analysis. *See Lake v. State*, 532 S.W.3d 408, 418-19 (Tex. Crim. App. 2017) (Yeary, J., concurring). I think it is highly unlikely that the Court intended to overrule the purposefully broad pronouncement in *Cain* in a rule adopted *just a few months later* that had the ostensible purpose of making a showing of harm more difficult by imposing a more harmless-friendly non-constitutional standard. *See* TEX. R. APP. P. 44.2(a) (West 1998) (effective September 1, 1997). Rather, it appears that the change in the wording of the constitutional standard was merely a recognition, as in *Cain*, of the reality of some structural errors and not an effort to abrogate or change the holding in *Cain*. This Court's continued adherence to *Cain* long after the rule change strongly reinforces my conclusion. *See infra.*

[59] *Gray v. State*, 159 S.W.3d 95, 96 (Tex. Crim. App. 2005) (quoting *Gonzales v. State*, 994 S.W.2d 170, 171-72 (Tex. Crim. App. 1999)).

[60] *See Hawkins v. State*, 135 S.W.3d 72, 82 (Tex. Crim. App. 2004) ("[T]he idea that violation of a 'mandatory statute' constitutes automatic reversible error contradicts our developing harmless error jurisprudence.") (citing *Cain* and *Almanza*); *Taylor v. State*, 109 S.W.3d 443, 450 (Tex. Crim. App. 2003) ("To the extent that prior cases (including *Morrow* and *Lane*) suggested that harm is automatic, they were overruled by *Cain v. State*, where we held that all errors are subject to a harm analysis except those labeled by the United States Supreme Court as structural."); *Ford v. State*, 73 S.W.3d 923, 925 (Tex. Crim. App. 2002) ("violation of a mandatory statute" rationale "would re-establish automatic reversible error, contrary to the language and purpose of Rule 44.2 and contrary to our opinion in *Cain*").

[61] *Becerra v. State*, 685 S.W.3d 120, 141 (Tex. Crim. App. 2024); *King v. State*, 666 S.W.3d 581, 587 (Tex. Crim. App. 2023); *Stredic v. State*, 663 S.W.3d 646, 655 n.30 (Tex. Crim. App. 2022); *cf. Rios v. State*, 665 S.W.3d 467, 485-86 (Tex. Crim. App. 2022) (finding the failure to accord a jury trial to be structural error based on the holding in *Sullivan v. Louisiana*, 508 U.S. 275 (1993), that a deficient "reasonable doubt" instruction was structural by denying the right to a jury trial).

been influenced by that decision, calling it "thoughtful."[62]

Moreover, the holding in *Cain* dovetailed with concerns expressed in *Almanza*, the fountainhead case for determining when jury-charge errors are reversible. "[I]n *Almanza v. State*, we decried a trend 'to label certain errors "fundamental" then automatically reverse convictions without regard to the nature and harm of the error in the case.'"[63]

If we backtracked on *Cain* now, and afforded the possibility that a large number of state constitutional errors could be structural, we would threaten to seriously undermine the salutary effects of *Cain*'s holding. The United States Supreme Court has recognized only a few structural errors,[64] but in the past this Court has not been so restrained. At the time it was handed down, *Almanza* itself recognized the labeling of errors as "fundamental" and automatically reversible as "[t]he modern trend" and a "movement [that] became almost suddenly firmly entrenched as a policy of the Court."[65] Without the limitation on "structural" errors imposed by *Cain*, this Court and the courts of appeals would be subject to significant temptations to hold various errors immune from a harm analysis even when the errors are clearly harmless.

Part of the point of both *Cain* and *Almanza* is that this Court should not ignore the reality of a particular error being obviously harmless. As this Court said in *Almanza*, "As a court of last resort we should not be so far removed from reality that we cannot see when common sense coincides with

---

[62] *In re D. I. B.*, 988 S.W.2d 753, 758-59 (Tex. 1999).

[63] *Hawkins*, 135 S.W.3d at 82 (quoting *Almanza*, 686 S.W.2d at 172-73).

[64] *Greer v. United States*, 593 U.S. 503, 513 (2021) ("Only in a 'very limited class of cases' has the Court concluded that an error is structural, and 'thus subject to automatic reversal' on appeal.").

[65] *Almanza*, 686 S.W.2d at 172-73.

the fair administration of justice."[66]  And there is really no significant downside to imposing a harm analysis.  At least when an error is constitutional and preserved, the "beyond a reasonable doubt" standard for finding harm is lenient, and any difficulty in determining harm amounts to a finding that the error was harmful.[67]  And if a more onerous harm analysis applies because error was not preserved, that is because the failure to preserve itself affects a determination of whether the defendant's rights have been prejudicially infringed upon.  That seems, after all, to be the whole point of *Almanza* imposing separate harm standards for preserved and unpreserved jury-charge error.  It is also the point of the federal system imposing different standards for reversing on preserved error and "plain" error.  Ultimately, the fairest and most accurate way to approach harm is to just do the harm analysis and see where it leads.

**2. *A failure to object might forfeit the "structural" aspect of an error, or at least change how it is analyzed.***

Even if the Texas Constitution did include a category of "structural" errors, a failure to object to such an error could forfeit the structural aspect of the error, or at least change it so as to prevent an automatic finding of harm.  In *Jimenez*, this Court recognized that a federal harm analysis for a particular jury-charge error could be forfeited by a failure to object:

> But the "beyond-a-reasonable-doubt" standard for constitutional errors does not apply in this case because the error was not objected to.

\* \* \*

---

[66]  *Id.* at 173.

[67]  *See Cain*, 947 S.W.2d at 264 ("Of course, where the error involved defies analysis by harmless error standards or the data is insufficient to conduct a meaningful harmless error analysis, then the error will not be proven harmless beyond a reasonable doubt."); *see also D. I. B.*, 988 S.W.2d at 758-59 (quoting this passage in *Cain* for the proposition that "in many cases, the threshold for demonstrating harm is *minimal*") (emphasis added).

> [I]n order to invoke the protection of this federal rule in a state court, the appellant must have complied with the state court's procedural rule for preserving and presenting error.[68]

And even when the lack of preservation does not forfeit review altogether, how harm is evaluated could change:

> Most jurisdictions consider unpreserved error under rules for "plain error." The standards for plain error are different from those for preserved error. The standards for harm may be higher, and the burden of showing harm different. Even when the higher standards are met, the appellate court may have discretion whether to consider the error at all, extending review only to very serious errors.[69]

*Almanza* provides a straightforward example of this phenomenon, with its two-tiered harm framework, but the analysis could also apply to the "structural" nature of a particular error. For example, the United States Supreme Court has left as an open question whether the structural nature of an error would automatically satisfy *one* of the four prongs of a federal plain error analysis for unpreserved errors.[70] Answering that open question for Michigan, the Supreme Court of Michigan said it did, but that court still left room for the State to rebut a presumption of unfairness.[71] Even if the "structural" nature of an error suggested that conducting a harm analysis would not be worth the effort, that calculus might change if error were not preserved.

**3. *Even the complete omission of an element can be harmless under appropriate circumstances.***

---

[68] *Jimenez v. State*, 32 S.W.3d 233, 237-38 (Tex. Crim. App. 2000).

[69] *Id.* at 238.

[70] *United States v. Marcus*, 560 U.S. 258, 263 (2010).

[71] *People v. Davis*, 509 Mich. 52, 73-76 (2022) (recognizing "a formal rebuttable presumption" in the plain-error standard for forfeited structural errors).

*Prystash v. State*[72] illustrates how a missing element can easily be found harmless. In *Prystash*, the defendant was convicted of capital murder and sentenced to death.[73] The jury charge at the guilt stage included an instruction on the "intent to promote or assist" theory of the law of parties but did not include the conspiracy-liability theory of the law of parties.[74] Because the guilt-stage jury charge included the law of parties, the Texas statutory scheme required that the following "anti-parties" special issue be submitted:

> whether the defendant actually caused the death of the deceased or did not actually cause the death of the deceased but intended to kill the deceased or another or anticipated that a human life would be taken.[75]

At the urging of defense counsel, the trial court omitted the "anti-parties" special issue from the jury charge.[76] The Court's opinion found that the defendant had invited error and, so, was estopped from complaining about the omission of the special issue.[77]

But in her concurring opinion, Judge Keller pointed out that there was also no harm.[78] The anti-parties issue serves an important function if the guilt-stage jury instructions include the conspiracy-liability theory of the law of parties because that theory does not require the defendant

---

[72]  3 S.W.3d 522 (Tex. Crim. App. 1999).

[73]  *Id.* at 525.

[74]  *Id.* at 540-41 & n.4 (Keller, J., concurring).

[75]  *Id.* at 529 (Court's op.).

[76]  *Id.* at 529-30.

[77]  *Id.* at 531-32.

[78]  *Id.* at 537-41 (Keller, J., concurring).

to possess an actual anticipation that a human life will be taken.[79]  But the "intent to promote or assist" theory does require the defendant to possess such actual anticipation—and in fact requires a showing of intent to kill.[80]  So the guilt-stage jury charge required the jury to find everything needed to answer the anti-parties special issue "yes," making the omission of the anti-parties special issue harmless.[81]  *Prystash* shows that a jury charge in one stage of the trial could make harmless the failure to submit an entire issue at a different stage of trial.

*Martinez v. State* points to another way in which the entire omission of an element can be harmless—the verdict forms.[82]  Suppose causation had been omitted entirely from the second theory of murder in Appellant's jury charge, but the charge had also included a separate verdict form for each theory of murder and the jury had found Appellant guilty under both.  Because there was only one murder count (and because, in any event, the two theories are merely alternative means of committing a single murder), the trial court would have been obligated, under *Martinez*, to sentence Appellant for only one murder offense.[83]  But a jury answer of guilty on both verdict forms would

---

[79] *See id.* at 541 n.4 (quoting TEX. PENAL CODE § 7.02(b)) (requiring that the charged offense "should have been anticipated" during a conspiracy to commit another offense).

[80] *See id.* at 540-41.

[81] *Id.* at 541.

[82]  225 S.W.3d 550, 555 (Tex. Crim. App. 2007) (More verdict forms than counts were submitted to the jury, but the multiple verdict forms did eliminate any jury unanimity problems that might otherwise have attached to submitting what amounted to multiple offenses as part of the same count.).

[83] *See id.* ("The mistake the trial judge made here was in rendering judgment on all of those counts. . . . Once the judge receives the jury's verdicts, he should perform the task of deciding what judgment is authorized by those verdicts in light of the controlling law, the indictment, and the evidence presented at trial.").

have rendered harmless any deficiency with respect to the second murder theory. In that situation, we would know, without any doubt, that the jury found Appellant guilty under the *first* theory of murder, all of the elements of which were included in the abstract and application paragraphs.

Even Justice Scalia, upon whom the concurrence relies, did not completely eliminate a harm analysis for an omitted element:

> Insofar as it applies to the jury-trial requirement, the structural-error rule does not exclude harmless-error analysis—though it is harmless-error analysis of a peculiar sort, looking not to whether the jury's verdict would have been the same without the error, but rather to whether the error did not prevent the jury's verdict. The failure of the court to instruct the jury properly— whether by omitting an element of the offense or by so misdescribing it that it is effectively removed from the jury's consideration—can be harmless, if the elements of guilt that the jury did find necessarily embraced the one omitted or misdescribed.[84]

**F. Evaluation: Reasons 1 and 2 actually demonstrate that Appellant suffered no harm, even under the most lenient standard, but even if that were not true, these reasons definitely demonstrate that he suffered no egregious harm.**

Even if we used the most lenient harm standard available to Appellant—the constitutional harm standard that requires showing beyond a reasonable doubt that the error did not contribute to the defendant's conviction[85]—the omission of the causation element from the application paragraph would be harmless. The clear and concise abstract paragraph includes the causation element, and aside from the difficult-to-read application paragraph, everything else in the jury charge points to causation as an element. There is even authorizational language that would require the jury to give effect to the abstract paragraph and an instruction not to disregard any of the instructions (e.g., the abstract murder paragraph) and not to place special significance on any instruction (e.g., the

---

[84] *Neder*, 527 U.S. at 35 (Scalia, J., dissenting).

[85] *See* TEX. R. APP. P. 44.2(a).

application murder paragraph). Moreover, the State told the jury that causing death was an element of the second murder theory, and jurors in general already know that causing death is an element of murder. In fact, a claim that murder did not require causing death would be surprising to, not only the average juror, but probably *any* juror. Not only would such a claim be totally counterintuitive, but it would contradict other instructions in the jury charge and what the prosecutor said. This jury was not shy about seeking guidance from the trial court. If this jury really believed that the application paragraph was susceptible to this counterintuitive reading, and if it thought that counterintuitive reading might affect its decision, it would have sought the trial court's guidance. It did not.

And even if the jury had thought the causation element was missing, the other elements the jury was required to find would have required it to find causation anyway. To convict under the application paragraph, this jury would have to believe that Appellant strangled or suffocated the victim severely enough to create a substantial risk of death and that Appellant in fact intended this severe injury. This would entail not only finding that Appellant's conduct created a substantial risk of death but also that the inflicted injury created a substantial risk of death. Having found that the inflicted injury created a substantial risk of death, the jury could not find that Appellant's conduct was clearly insufficient to cause death under medical evidence that was at best ambiguous and at worst highly incriminating.

And supplementing both of these two main reasons is the fact that the "sudden passion" issue at the punishment stage clearly indicated that the jurors should have already found causation. The jurors actually sent the trial judge a note about sudden passion but said nothing about the causation language—suggesting that they were not at all surprised by it because they had in fact found

causation.

But even if one thought that the reasons for the application-paragraph omission being harmless did not quite rise to the confidence level of beyond a reasonable doubt, that is not the standard here. Appellant forfeited the right to an analysis under the constitutional harm standard by failing to object and is relegated to the statutory egregious-harm standard for unpreserved jury-charge error.[86] Unlike the lenient "beyond a reasonable doubt" standard, the "egregious harm" standard is a difficult standard to meet.[87] It is on the far end of the harm spectrum from the constitutional harm standard for preserved errors. And since, at worst, the harm question is close under the constitutional standard, it is no-brainer that egregious harm has not been shown.

I respectfully dissent.

Filed: May 7, 2025

Publish

---

[86] *See Jimenez*, 32 S.W.3d at 236-38.

[87] *See supra* at n.2.



**DAVID J. SCHENCK**
PRESIDING JUDGE

**BERT RICHARDSON**
**KEVIN P. YEARY**
**DAVID NEWELL**
**MARY LOU KEEL**
**SCOTT WALKER**
**JESSE F. MCCLURE, III**
**LEE FINLEY**
**GINA G. PARKER**
JUDGES

# COURT OF CRIMINAL APPEALS

P.O. BOX 12308, CAPITOL STATION
AUSTIN, TEXAS 78711

**DEANA WILLIAMSON**
CLERK
(512) 463-1551

**SIAN SCHILHAB**
GENERAL COUNSEL
(512) 463-1597

May 7, 2025

2nd Court Of Appeals Clerk
401 W. Belknap, Ste 9000
Fort Worth, TX 76196
* Delivered Via E-Mail *

District Clerk Tarrant County
401 W. Belkap
Fort Worth, TX 76196
* Delivered Via E-Mail *

**Re:** Alkayyali, Tareq
**CCA No.** PD-0290-23
**Trial Court Case No.** 1598293D

**COA No.** 02-21-00197-CR

The court has issued an opinion on the above referenced cause number.

Sincerely,

Deana Williamson, Clerk

cc:  State Prosecuting Attorney (Delivered Via E-Mail)
John R. Messinger (Delivered Via E-Mail)
Presiding Judge 396th District Court (Delivered Via E-Mail)
Heather Lytle (Delivered Via E-Mail)
Victoria Ford Oblon (Delivered Via E-Mail)